Submitted May 29, 2013, reversed and remanded August 26, petition for review allowed December 24, 2015 (358 Or 527)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANTONIO MACIEL-FIGUEROA,
*Defendant-Appellant.*

Polk County Circuit Court
11P3134; A148894

356 P3d 674

Peter Gartlan, Chief Defender, and Zachary Lovett Mazer, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Wollheim, Senior Judge.

DUNCAN, P. J.

## DUNCAN, P. J.

Defendant appeals a judgment convicting him of one count of identity theft, ORS 165.800, one count of unlawful possession of methamphetamine, ORS 475.894, one count of giving false information to a peace officer for a citation, ORS 162.385, and one count of tampering with physical evidence, ORS 162.295. He assigns error to the trial court's denial of his motion to suppress evidence that a police officer discovered after defendant consented to a search for weapons. Defendant argues that his consent was given only after the officer unlawfully stopped him. We conclude that the officer did not have reasonable suspicion to stop defendant and, therefore, the officer violated Article I, section 9, of the Oregon Constitution.[1] We further conclude that the state failed to prove that the evidence was nonetheless admissible. Accordingly, we reverse and remand.

We review a trial court's denial of a motion to suppress for errors of law, and are bound by the trial court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Where the trial court did not make express findings and there is evidence from which the trial court could have found a fact in more than one way, we will presume that the facts were decided in a manner consistent with the trial court's ultimate conclusion. *Id.*

On the morning in question, Officer Moffitt was on patrol duty. He received a call from dispatch to respond to a disturbance at a home where a woman named Jennifer Velek resided. Velek's mother had called the police and reported that Velek had called her and said that someone named Antwon Wilson was at her house and was threatening to break things. Velek's mother reported that she could hear a lot of yelling in the background when she was speaking to her daughter, and she requested that the police go to Velek's home. Moffitt knew Velek, had been to her home on numerous occasions, and was familiar with the layout of the residence. Corporal Welsh, an officer who also responded to the

---

[1] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

call, believed that the behavior Velek's mother had reported could constitute menacing, assault, or criminal mischief.

Ten minutes after Velek's mother called the police, Moffitt and Welsh arrived to investigate the disturbance. They parked a few houses away and walked on the sidewalk toward Velek's home. When they were near the home, they saw defendant walking down Velek's driveway. Based on his knowledge of the layout of Velek's home, Moffitt was certain that defendant had come from the home. Defendant, who did not see the two officers, reached the sidewalk and turned in the direction away from the officers.

Moffitt believed that defendant might have been involved in the disturbance at Velek's home, and he called out to defendant and asked to speak with him. Defendant looked toward the officers, put his hands in his pockets, and continued to walk away from them. Moffitt "began to address [defendant] more[,]" identifying himself as a police officer, and directing defendant to "come back" and speak to the officers. Defendant stopped and turned toward the officers, and Moffitt instructed defendant to take his hands out of his pockets. Defendant took his hands out of his pockets, and then he began to walk a little bit faster back towards the house, putting his hands in his pockets again.

Defendant's actions led Moffitt to believe that defendant might have a weapon and that he would barricade himself inside Velek's home. Moffitt called out to defendant at least three more times, and defendant finally stopped at the front porch of Velek's home. The officers approached defendant, and Moffitt asked defendant if he had any weapons. When defendant denied that he had any weapons, Moffitt asked if he could search him, and defendant said that he could. Moffitt had defendant turn and face away from him and interlace his fingers behind his back. Moffitt took hold of defendant's fingers and asked defendant if he had any weapons or drugs. Defendant said that he did not. Moffitt again asked defendant if he could search him, and defendant said that he could.

Moffitt searched defendant and felt a methamphetamine pipe in his front pocket. Defendant admitted to Moffitt that the pipe had methamphetamine residue in it. Defendant

told Moffitt that he had taken the pipe and a scale that was located in his other pocket from Velek, who was inside the house. At that point, Moffitt determined that he had probable cause to arrest defendant. Moffitt handcuffed defendant and then turned his attention to the two other individuals he could now see were also outside the home. One of those individuals was Velek, and the other was Wilson, the person who was the subject of the disturbance call.

The officers eventually questioned defendant, who gave them a false name and a false birth date. The officers also discovered a Mexican-issued identification card with the same false name in defendant's wallet. Based on the false identification information that defendant provided, as well as the methamphetamine pipe, the methamphetamine residue, the scale, and defendant's intention to remove those items from Velek's house, the state indicted defendant for identity theft, unlawful possession of methamphetamine, giving false information to a police officer for a citation, and tampering with physical evidence.

Defendant moved to suppress all of the evidence derived from Moffitt's search, arguing that the officers had stopped him without reasonable suspicion that he had committed a crime, thereby violating his rights under Article I, section 9, and under the Fourth Amendment to the United States Constitution.[2] After a hearing on the motion, the trial court concluded that the officers stopped defendant when, after defendant saw the officers and continued to walk away, Moffitt called out to him a second time and directed him to return to the officers. Nevertheless, the trial court concluded that the stop was lawful because the officers had reasonable suspicion to believe that a crime had been committed and that defendant had committed it. The trial court further concluded that, once the officers lawfully stopped defendant, they could search him pursuant to the officer-safety exception to the warrant requirement.

---

[2] The Fourth Amendment to the United States Constitution provides that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

On appeal, defendant argues that the trial court correctly concluded that the officers stopped him, but he asserts that the trial court erred in determining that the officers had reasonable suspicion to justify the stop. Defendant first asserts that the initial disturbance call to the police was unreliable, and, thus, could not support an objectively reasonable suspicion that a crime had been committed. Next, defendant argues that the call did not necessarily "indicate criminal activity." Finally, defendant argues that the officers did not have objectively reasonable suspicion that defendant was the one involved in the disturbance.

The state concedes that "Moffett stopped defendant when he called out for defendant to stop so that the officers could speak with him[,]" but it argues that the stop was supported by reasonable suspicion. The state asserts that the disturbance call was sufficiently reliable to establish reasonable suspicion. Additionally, the state argues that "although Velek's mother did not specifically report that [Wilson] was committing a crime inside her daughter's residence, it was reasonable for Moffitt to believe that a crime of some sort had occurred or was about to occur." Finally, the state contends that, because Moffitt—based on his previous visits to Velek's home—was certain that defendant had just left the home and because defendant avoided the officers, there was reasonable suspicion that defendant was the one who had caused the disturbance.

"Article I, section 9, requires the police, before stopping an individual, to have reasonable suspicion that the individual is involved in criminal activity. In the absence of reasonable suspicion (or some other permissible concern, such as officer safety), the individual has the right to be free from police interference and may terminate an encounter with police at will." *State v. Unger*, 356 Or 59, 71, 333 P3d 1009 (2014). "Reasonable suspicion has a subjective and an objective component: an officer has reasonable suspicion when the officer subjectively believes that the person has committed a crime and that belief is objectively reasonable in light of the totality of the circumstances." *State v. Moore*, 264 Or App 86, 89, 331 P3d 1027 (2014) (citing *Ehly*, 317 Or at 79). To be objectively reasonable, an officer's suspicion must be based on specific and articulable facts. *Ehly*, 317 Or

at 80. Reasonable suspicion does not require that the facts conclusively indicate illegal activity but, rather, "only that those facts support the reasonable inference that a person has committed a crime." *State v. Hammonds/Deshler*, 155 Or App 622, 627, 964 P2d 1094 (1998) (emphasis omitted).

"When reasonable suspicion is based solely on a citizen informant's report, that report must contain some indicia of reliability." *State v. Villegas-Varela*, 132 Or App 112, 115, 887 P2d 809 (1994). There are three factors for determining the reliability of a citizen informant's report:

> "One is whether the informant is exposed to possible criminal and civil prosecution if the report is false. That factor is satisfied if the informant gives his or her name to law enforcement authorities or if the informant delivers the information to the officer in person. The second factor is whether the report is based on the personal observations of the informant. An officer may infer that the information is based on the informant's personal observations if the information contains sufficient detail that it is apparent that the informant had not been fabricating the report out of whole cloth and the report is of the sort which in common experience may be recognized as having been obtained in a reliable way. The final factor is whether the officer's own observations corroborated the informant's information. The officer may corroborate the tip either by observing the illegal activity or by finding the person, the vehicle and the location substantially as described by the informant."

*Id.* (internal quotation marks and citations omitted). However, even if the second factor is not satisfied, the reliability of the report is not necessarily undermined. *See State v. Mitchele*, 240 Or App 86, 93, 251 P3d 760 (2010). For example, in *Mitchele*, an informant reported information to the police that he had learned from his wife, including that a suspicious individual was "casing" homes in the informant's neighborhood for possible burglaries and a description of the individual and his clothes. *Id.* at 88. Officers responded to the call and encountered the defendant in the informant's neighborhood. The defendant was wearing clothes that matched the informant's description and he tried to "tuck" himself into nearby foliage as the officers approached. *Id.* at 88-89. On appeal, we determined that, while the second factor was not satisfied because the report was not based

on the informant's first-hand observations, the report was nonetheless reliable because

> "[t]he report's details, including the description of defendant's clothing, location, and actions, are sufficient to show that neither the caller nor the caller's wife had fabricated the report. Further, defendant fail[ed] to present a reason why either the caller or the caller's wife would fabricate the information, and their spousal relationship suggests that the caller would and did believe the source of the information and that the information had been reliably obtained."

*Id.* at 92.

Here, because Velek's mother provided her name to the police when making her report, defendant concedes that the first factor is satisfied. *See id.* at 91-92. As for the second factor, defendant points out that "the tip in this case was not based entirely on [Velek's mother's] own personal observations[,]" and, the tip "did not provide a detailed description of the alleged perpetrator or * * * the alleged criminal activity." Defendant concedes that "the second-hand nature of the information did not trouble the court in *Mitchele*," but he asserts that "this case is distinguishable" because, as compared to the "highly detailed" report in *Mitchele*, "which supported an inference that it was based on personal observations[,] [h]ere, * * * the information supplied to [Velek's mother] by [Velek] * * * indicated only that someone named [Wilson] was yelling and threatening to break things." For its part, the state simply asserts that Velek's mother based her report on Velek's "self-report to her, as well as her own corroborating personal observations made while speaking with Velek." Lastly, as for the third factor, defendant argues that Moffitt's observations at Velek's home "contradicted the tip" because defendant "did not seem * * * as if he had been involved in a disturbance[,]" and, initially, he did not "seem hurried or like he was trying to run away[.]" The state counters that, "although Moffitt did not observe defendant engage in any other notable behavior, given the information provided and defendant's presence at Velek's residence, [Moffitt] reasonably inferred that [defendant] was the subject who had been threatening to break Velek's belongings ten minutes earlier."

Despite the parties' focus on Velek's mother's report, we need not determine whether the report was sufficiently reliable, because, even assuming that it was, the facts known to the officers at the time of the stop—including the information from Velek's mother—were not sufficient to support an objectively reasonable conclusion that a crime had occurred. On this point, *Moore*, 264 Or App 86, is instructive.

In *Moore*, a landowner whose property was in a rural and densely wooded area contacted the police to report that two "suspicious" individuals had "parked a vehicle on her property." The landowner described the individuals' vehicle and license plate to the police dispatcher but did not report that she had told the individuals that they were on her property or that she had asked them to leave. Rather, she reported that she had asked them if they needed help; they had declined and told her they were working at a nearby Christmas tree farm. *Id.* at 87. A deputy responded to the call and found the defendant's car—which matched the landowner's description—on the shoulder of a paved, public road. The deputy could not determine whether the vehicle was on the landowner's property. *Id.* at 87-88. Shortly after the deputy arrived, the defendant walked out of some nearby woods and returned to the car. When questioned, the defendant told the deputy that he had been hunting mushrooms on the property and that he had permission from the owner—someone other than the landowner who initiated the report—to be there. The deputy proceeded to stop the defendant and ultimately obtained the defendant's consent to search him for weapons. During the search, the deputy found drugs. *Id.* at 88.

The defendant moved to suppress all evidence from the search, and the trial court denied the motion. *Id.* at 88-89. Similar to this case, the defendant argued on appeal that (1) the landowner's report was not sufficiently detailed to be reliable; (2) the deputy's observations did not sufficiently corroborate the report; and (3) the report and the deputy's observations did not establish the elements of the offense of trespassing. We concluded that the defendant's third argument was correct, and did not address the first two. *Id.* at 90.

We examined the elements of criminal trespass, noting that the crime requires an individual "'[t]o enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so.'" *Id.* (quoting ORS 164.205(3)(a)). We stated that "property is open to the public—and not subject to criminal trespass—when some characteristic of the property objectively would cause a reasonable person to believe he or she is free to enter or remain on the property without permission, even if the owner intends the property to be private and requires permission to be there." *Id.* at 91.

Against that backdrop, we first noted that the location of the defendant's vehicle on the side of the road did not support a reasonable belief that the defendant was trespassing, because it was customary for vehicles to park on the shoulder of the road and there were no characteristics of the shoulder that might have communicated to a reasonable person that it was private property instead of part of the public road. *Id.* at 91-92. We then stated that the landowner's description of the individuals as "suspicious" and as refusing help did not make it any more likely that the defendant was trespassing. Finally, we stated that there was nothing in the record that indicated that the woods from which the defendant had emerged were part of the landowner's property or that the defendant was not privileged to be there. *Id.* at 92-93. Accordingly, we concluded that "the facts known to [the deputy] at the time of the stop were not sufficient to support an objectively reasonable conclusion that defendant was trespassing[,]" and, thus, the stop was unlawful. *Id.* at 93. *See also State v. Musser*, 253 Or App 178, 183-84, 289 P3d 340 (2012), *aff'd*, 356 Or 148, 335 P3d 814 (2014) (officer did not have reasonable suspicion to stop the defendant for trespassing because there were no apparent restrictions on public access to the elevated walkway where the officer first encountered the defendant and the walkway was physically distinct from the areas where there were restrictions); *State v. Morton*, 151 Or App 734, 739 n 4, 951 P2d 179 (1997), *rev den*, 327 Or 521 (1998) (stating that, "even if the evidence could give rise to a reasonable suspicion that [the defendant] was under the influence of marijuana, it is not a crime to

possess less than an ounce of marijuana; it is only a violation[,]" and thus the facts did not "give rise to a reasonable inference that defendant had committed a crime" (emphasis omitted)).

In this case, Welsh believed that the disturbance could involve the crimes of menacing, assault, or criminal mischief. We examine each crime in turn. A person commits the crime of menacing "if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury." ORS 163.190. However, Velek's mother did not report that Wilson had placed Velek or anyone else in fear of physical injury; rather, she reported that Wilson was threatening to break Velek's belongings. For an individual to commit any degree of assault, the individual must cause physical injury to another person. *See* ORS 163.160; ORS 163.165; ORS 163.175; ORS 163.185. But Velek's mother did not report any violence, physical injuries, or any imminent violence. Finally, for a person to commit any degree of criminal mischief, the person must damage, interfere, or tamper with in some way the property of another. *See* ORS 164.365; ORS 164.354; ORS 164.345. Thus, without more, Wilson "threatening" to break things and yelling could not constitute criminal mischief. Additionally, the officers did not observe anything that would lead to a reasonable inference that menacing, assault, or criminal mischief was occurring or had recently occurred. For example, they did not witness any violence, encounter any injured people, hear items breaking, or observe broken objects. As such, similar to *Moore*, although the officers had received a call from an identified person, the information that the caller provided, in context with the circumstances that the officers observed, was insufficient to give rise to an objectively reasonable suspicion that defendant had committed any of the crimes Welsh mentioned.

The state itself does not identify any crimes for which reasonable suspicion existed at the time of the stop. The state asserts that the officers had reasonable suspicion that defendant may have committed a "number of possible crimes[,]" and that "although Velek's mother did not specifically report that [Wilson] was committing a crime inside

her daughter's residence, it was reasonable for Moffitt to believe that a crime of some sort had occurred or was about to occur[,]" but the state does not identify what crime or crimes the officers could have reasonably suspected.

The cases the state cites to support its argument that Moffitt had reasonable suspicion to stop defendant are distinguishable because, unlike the facts presented here, in each of those cases, the officer had information that the defendant had committed a specific crime. *See State v. Belt*, 325 Or 6, 13, 932 P2d 1177 (1997) (reasonable suspicion of prostitution, ORS 167.007); *Mitchele*, 240 Or App at 94 (reasonable suspicion of attempted burglary, ORS 164.215, ORS 161.405); *State v. Goss*, 219 Or App 645, 652, 184 P3d 1155, *rev den*, 345 Or 94 (2008) (reasonable suspicion of driving under the influence of intoxicants, ORS 813.010); *Hammonds/Deschler*, 155 Or App at 626-27 (reasonable suspicion of prostitution, ORS 167.007); *State v. Crites*, 151 Or App 313, 316, 948 P2d 757 (1997), *rev den*, 327 Or 82 (1998) (reasonable suspicion of transporting special forest products without a permit, ORS 164.813).

Accordingly, we conclude that, even assuming that Velek's mother's report was reliable, the report did not give rise to an objectively reasonable suspicion that a crime had been committed. Given that conclusion, we need not address whether the officers reasonably suspected that defendant was the one who had engaged in the reported conduct.

Our determination that defendant was unlawfully stopped for purposes of Article I, section 9, means that the evidence must be suppressed unless the state proves "that the consent was voluntary and was not the product of police exploitation of that illegality." *State v. Musser*, 356 Or 148, 150, 335 P3d 814 (2014) (citing *Unger*, 356 Or at 74-75). The state argues that, even if the officer's stop of defendant was illegal, the evidence obtained as a result of the stop is admissible because defendant's consent was voluntary. But the state has not argued, either in the trial court or on appeal, that defendant's consent was not the product of police exploitation of the illegal stop. Instead, the state's position on appeal is that "no 'exploitation' analysis should be necessary." The Supreme Court rejected that position in

*State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and *Unger*, 356 Or 59. Because the state, which bears the burden of proving the admissibility of evidence derived from unlawful police conduct, has failed to argue—at trial or on appeal—that defendant's consent was not the product of police exploitation of the illegal stop, the trial court erred by denying defendant's motion to suppress. *See State v. Kimmons*, 271 Or App 592, 602, 352 P3d 68 (2015) (concluding that the trial court erred by denying the defendant's motion to suppress, because, "despite the fact that it bears the burden of proving that defendant's consent to the search of her car was sufficiently attenuated from any illegal police conduct, * * * the state offers no reasoned explanation * * * as to why, in the totality of the circumstances of this case, suppression is not required"); *State v. Norton*, 270 Or App 584, 592, 349 P3d 576 (2015) (holding that the trial court erred by denying the defendant's motion to suppress, "[b]ecause the state made no effort before the trial court (or on appeal) to demonstrate that the evidence obtained during the unlawful stop is nevertheless admissible"); *State v. Rider*, 216 Or App 308, 315, 172 P3d 274 (2007), *rev dismissed*, 345 Or 595 (2008) (concluding that the defendant's consent was the unattenuated product of the unlawful stop because the state advanced no argument that some fact or circumstance severed the causal connection between the stop and the defendant's consent); *see also State v. Fowler*, 273 Or App 20, 25, 359 P3d 276 (2015) (declining to consider state's argument, made for the first time on appeal, that officer's illegal stop of the defendant did not affect the defendant's decision to consent, stating that, if the state had made the argument in the trial court, the record might have developed differently); *State v. Heater*, 271 Or App 538, 543-44, 351 P3d 776 (2015) (same). Because the evidence that should have been suppressed was essential to defendant's convictions, the error was not harmless, and we must reverse and remand.[3]

Reversed and remanded.

---

[3] Because we conclude that the evidence should have been suppressed under Article I, section 9, we need not address defendant's arguments under the Fourth Amendment.