No. 13 March 2, 2017 163

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

ANTONIO MACIEL-FIGUEROA,
*Respondent on Review.*

(CC 11P3134; CA A148894; SC S063651)

En Banc

On review from the Court of Appeals.*

Argued and submitted May 9, 2016.

Susan G. Howe, Assistant Attorney General, Salem, filed the brief for petitioner on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Ernest G. Lannet, Chief Defender, Salem, filed the brief for respondent on review.

Elizabeth G. Daily, Portland, filed the brief for *amicus curiae* Oregon Justice Resource Center. Also on the brief was Corinne Fletcher.

NAKAMOTO, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____

* Appeal from Polk County Circuit Court, Monte S. Campbell, Judge. 273 Or App 298, 356 P3d 674 (2015).

**NAKAMOTO, J.**

This criminal case concerns whether police officers violated the prohibition against unreasonable seizures in Article I, section 9, of the Oregon Constitution, when they responded to a report that a named man was threatening to break things in a house, they saw defendant walking away from the house, and they ordered him to stop and return for questioning. The trial court concluded that the officers had reasonable suspicion to stop defendant to investigate whether he had committed a crime; thus, it denied defendant's motion to suppress evidence resulting from the stop. The Court of Appeals reversed. *State v. Maciel-Figueroa*, 273 Or App 298, 308, 356 P3d 674 (2015).

We allowed the state's petition for review to consider the state's contention that the Court of Appeals erroneously heightened the standard that the state must meet to establish that an investigatory stop was supported by reasonable suspicion. In the state's view, a police officer may stop any person "if the officer reasonably believes that the person was either somehow involved with, or a witness to, possible criminal activity." The state contends that the Court of Appeals instead required the state to show that, before stopping defendant, the police had confirmed that he had committed a crime.

As we explain, although there has been some variation in this court's articulation of the standard, the established standard for reasonable suspicion supporting an investigatory stop of a defendant is met when an officer can point to specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit a specific crime or type of crime. We further conclude that the Court of Appeals correctly applied the reasonable-suspicion standard to the facts established at the suppression hearing, which concerned whether it was reasonable for the officers to infer that defendant had committed a crime. Accordingly, we affirm the decision of the Court of Appeals and reverse the judgment of the trial court.

## I.   BACKGROUND

We review a trial court's denial of a motion to suppress for legal error, and we are bound by the trial court's

factual findings if there is any constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). When the trial court did not make express findings and there is evidence from which the trial court could have found a fact in more than one way, we will presume that the trial court decided the facts consistently with the trial court's ultimate conclusion. *Id.* We take the facts from the Court of Appeals opinion and the record of the suppression hearing, viewed consistently with those standards.

Two Salem police officers, Officer Moffitt and Corporal Welsh, responded to a report of a disturbance at a home where a woman named Velek lived. Velek's mother had called the police and reported that she had just spoken with her daughter, who "said that someone named * * * Wilson was at her house and was threatening to break things." *Maciel-Figueroa*, 273 Or App at 299. "Velek's mother reported that she could hear a lot of yelling in the background when she was speaking to her daughter, and she requested that the police go to her daughter's house." *Id.* Moffitt knew Velek from previous contacts at the residence, and he was familiar with the layout of her house.

Ten minutes after Velek's mother called the police, Moffitt and Welsh each arrived by car to investigate the disturbance. "They parked a few houses away and walked on the sidewalk toward Velek's home. When they were near the home, they saw defendant walking down Velek's driveway." *Id.* at 300. Moffitt thought that defendant was walking at a normal pace, but Welsh thought that defendant's pace "seemed a little bit rapid." "Based on his knowledge of the layout of Velek's home, Moffitt was certain that defendant had come from the home." *Id.* Defendant, who did not appear to see the two officers, "reached the sidewalk and turned in the direction away from the officers." *Id.*

Moffitt called out to defendant and asked to speak to him. Defendant looked toward the officers, put his hands in his pockets, and continued to walk away from them. At that point, Moffitt stopped defendant by identifying himself as a police officer and directing defendant to come back and speak with them. Moffitt further instructed defendant to take his hands out of his pockets. After defendant did that,

"he began to walk a little bit faster back towards the house, putting his hands in his pockets again." *Id*. After Moffitt called out to defendant at least three more times, defendant stopped at the front porch of Velek's house.

The officers approached, and Moffitt asked defendant whether he had any weapons or drugs, which defendant denied. Then, with defendant's consent, Moffitt searched him. The search immediately yielded a methamphetamine pipe. After handcuffing defendant, Moffitt turned his attention to the two other individuals outside Velek's house, who were then visible to Moffitt. One of them was Velek, and the other turned out to be Wilson, the man identified in the disturbance call from Velek's mother. Eventually, the officers discovered that defendant had given them a false name and possessed an identification card containing the same false name.

After defendant was charged with unlawful possession of methamphetamine, giving false information to a police officer for a citation, identity theft, and tampering with physical evidence, he moved to suppress all of the evidence derived from Moffitt's search. He argued that the officers had stopped him without reasonable suspicion that he had committed a crime, thereby violating his rights under Article I, section 9, of the Oregon Constitution.[1]

At the suppression hearing, both officers testified about the circumstances that had led them to believe that they had reasonable suspicion to stop defendant. The trial court found their testimony to be credible.

Moffitt testified that he believed that defendant "may have been involved with the disturbance" and "may have been the one yelling and threatening to break things at the home." Moffitt disagreed with the prosecutor's suggestion that the call implied that there was a "domestic disturbance," explaining, "Well, there was a disturbance. It was never titled as a domestic. It was a disturbance. That there was somebody there, yes." Moffitt did not specify what

---

[1] Defendant also moved to suppress the evidence under the Fourth Amendment to the United States Constitution. Defendant did not make a separate argument under the federal constitution, and, on review, only the state constitutional provision is at issue.

crime he had believed that defendant had committed, but he testified that, "most likely from the call," he believed that the officers "had a crime [that] had been committed in the residence, and [he] initially believed [that defendant] was [Wilson] walking away from the front of the house." Moffitt based that belief solely on the content of the disturbance call and the fact that defendant was a male walking down the driveway and away from the house.

Although Moffitt stated in his testimony that he believed that defendant might have committed "a crime" in the house, Welsh eventually specified possible crimes that defendant might have committed. Welsh testified that, when he arrived at the residence, he believed that "maybe a crime had been committed" and that "there was probably something going on." He was responding to "an unknown-type call, but clearly a disturbance" in Velek's house. Welsh explained that, when responding to a call "that there's somebody in there threatening to start destroying stuff," he would not know specifically what type of crime might have been committed; "it could be anything at that point." But in response to a suggestion by the prosecutor, Welsh proposed that possible crimes could include criminal mischief, menacing, and assault. He also testified that he had believed that he had reasonable suspicion to stop defendant when he saw defendant walking away from the house, because the officers "didn't know if [they] had a victim inside that was assaulted or what *** his involvement was at that point."

The trial court concluded that, when the officers had stopped defendant by directing him to return to the house, they had "reasonable suspicion that a crime had been committed, and it was reasonable to believe that [defendant] was that person who committed it." Accordingly, the trial court denied defendant's motion to suppress. Ultimately, the trial court convicted defendant on all charges in a stipulated-facts trial.

Defendant appealed the judgment of conviction and assigned error to the trial court's denial of his motion to suppress. The Court of Appeals decided the case on the lack of reasonable suspicion. The court concluded that "the facts known to the officers at the time of the stop—including the

information from Velek's mother—were not sufficient to support an objectively reasonable conclusion that a crime had occurred." *Id.* at 305.

Focusing on the contents of the report from Velek's mother and what the officers had observed, the Court of Appeals evaluated the facts known to the officers at the time of the stop, in light of the elements of criminal mischief, assault, and menacing—the potential crimes that Welsh had identified during his testimony. *Id.* at 305-07 (relying on *State v. Moore*, 264 Or App 86, 89-93, 331 P3d 1027 (2014), for reasonable-suspicion analysis). Based on the record at the suppression hearing, the court concluded that the officers could not have reasonably suspected that criminal mischief, assault, or menacing had occurred or were occurring inside Velek's house, because the officers had not been aware of facts that would have led a reasonable person to infer that physical injury, property damage, or violence had occurred or was occurring inside the home. *Id.* at 307; *see also* ORS 163.185 (person commits "assault" when he or she causes "serious physical injury" to another); ORS 163.190 (person commits "menacing" when he or she "intentionally attempts to place another person in fear of imminent serious physical injury"); ORS 164.345 - 164.365 (person commits "criminal mischief" when he or she damages, interferes, or tampers with another person's property).

The Court of Appeals also rejected the state's argument that the police need not suspect a defendant of a specific crime, as long as the officer reasonably believes "that a crime of some sort ha[s] occurred or [is] about to occur." *Id.* at 307-08. Because the court concluded that the officers lacked reasonable suspicion to stop defendant, and the state failed to controvert that the evidence subsequently discovered was the unlawful product of that unlawful stop, the court concluded that the trial court should have suppressed the evidence. *Id.* at 308-09. Accordingly, the Court of Appeals reversed defendant's convictions. *Id.* at 309.

## II.   ANALYSIS

Neither party disputes the trial court's conclusion that a "stop"—the kind of seizure of a person that is

a temporary detention for investigatory purposes, *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991)—occurred when the officers directed defendant to return to the house for questioning. The sole issue on review is whether that stop was lawful under Article I, section 9, of the Oregon Constitution, which provides, in part: "No law shall violate the right of the people to be secure in their persons *** against unreasonable *** seizure[.]" "Reasonable suspicion" is the term of art that encapsulates the degree of justification that a police officer must have before conducting a criminal investigative stop under Oregon law. *See, e.g.*, *State v. Watson*, 353 Or 768, 775-81, 305 P3d 94 (2013) (so explaining).

Whether the officers stopped defendant based on reasonable suspicion depends on what the reasonable-suspicion standard is and how it was applied in this case. The state and defendant fundamentally disagree concerning those matters. According to the state, the Court of Appeals erred by reformulating the standard so that reasonable suspicion now requires "an officer to (1) *conclude* that a (2) *crime* had in fact been (3) *committed*." (Emphases in state's brief.) In the state's view, the proper standard for "reasonable suspicion" is instead whether the totality of circumstances provides a "moderate chance" that "criminal activity" may be "afoot" and that the person stopped was "somehow involved." For that formulation of the standard, the state relies on *Safford Unified School District # 1 v. Redding*, 557 US 364, 371, 129 S Ct 2633, 174 L Ed 2d 354 (2009), *State v. Valdez*, 277 Or 621, 626, 561 P2d 1006 (1977), and *[State v. Holdorf](#)*, 355 Or 812, 820, 333 P3d 982 (2014). Defendant, on the other hand, disagrees that an officer's "generalized suspicions that 'criminal activity may be afoot' and that the person might be 'involved'" are sufficient to justify a seizure of the person, and he contends that the Court of Appeals correctly applied the reasonable-suspicion standard as it has long been understood in Oregon.

A.  *The Reasonable-Suspicion Standard*

Because the state contends that the Court of Appeals changed the reasonable-suspicion standard itself, heightening the state's burden, we review the foundation of the reasonable-suspicion standard and this court's historical

formulations of that standard in detail. We conclude that, although the state has accurately quoted phrases from a number of cases to form its proffered reasonable-suspicion standard, the state's formulation is incorrect and so general that it would undermine the ability of courts to review the basis for an investigatory stop. We also conclude that the Court of Appeals correctly applied the reasonable-suspicion standard.

We begin with two foundational principles. First, the term "reasonable suspicion" implements the prohibition in Article I, section 9, against "unreasonable" seizures, by recognizing that, in some cases, it will not be constitutionally unreasonable for the police to seize a citizen without a warrant. *See State v. Fair*, 353 Or 588, 602, 302 P3d 417 (2013) (citing *State v. Cloman*, 254 Or 1, 7, 456 P2d 67 (1969)). The reasonable-suspicion standard balances "the practical necessities of effective law enforcement," *Cloman*, 254 Or at 8 (internal quotation marks and citation omitted), with the need "to prevent arbitrary and oppressive interference by [law] enforcement officials with the privacy and personal security of individuals," *Fair*, 353 Or at 602 (internal quotation marks and citation omitted). The standard was developed with the recognition that a criminal investigative "stop," although less intrusive than an arrest, is still a constitutionally significant seizure. *See State v. Unger*, 356 Or 59, 71, 333 P3d 1009 (2014). Consistently with the balancing inherent in Article I, section 9, "reasonable suspicion" requires a degree of justification for a stop that is commensurate with the intrusiveness of the stop. *Fair*, 353 Or at 602.

Second, as appropriate, this court will borrow from its decisions applying the reasonable-suspicion standard contained in the statutes authorizing criminal investigative stops, ORS 131.615 and ORS 131.605(6),[2] when analyzing the reasonable-suspicion standard that applies in cases

---

[2] ORS 131.615(1) now provides that "[a] peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry." ORS 131.605(6) defines "[r]easonably suspects" to mean "that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts."

challenging the constitutionality of a stop under Article I, section 9. Those statutes, initially enacted in 1973, represented the legislature's determination of how to codify this court's interpretation of Article I, section 9, in *Cloman*, 254 Or at 7, and the United States Supreme Court's interpretation of the requirements of the Fourth Amendment to the United States Constitution in *Terry v. Ohio*, 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968). As this court has noted, the Commentary to the criminal procedure code explains that the provision codified as ORS 131.615 was intended to give "'the courts leeway to interpret the protean situations that arise" and to give "'the officer limited "stopping" powers.'" *Valdez*, 277 Or at 625 (quoting Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Procedure Code, Final Draft and Report § 31, 26 (Nov 1972)).

The legislature did not enact ORS 131.615 exactly as the Criminal Law Revision Commission had proposed. *Valdez*, 277 Or at 625 n 4. More limited than the rule in *Terry*, which had involved a stop based on suspected imminent criminal activity, the legislature's initial statutory formulation required that a police officer reasonably suspect that a person "has committed a crime" before stopping the person for investigation; it did not authorize stopping a person whom the officer suspected "is about to commit" a crime. *Id.*; Or Laws 1973, ch 836, § 31. More than 20 years later, in 1997, the phrase "or is about to commit" a crime was added to ORS 131.615(1). Or Laws 1997, ch 866, § 1.

Oregon case law concerning the reasonable-suspicion standard has developed over the last half-century based in part on an officer's statutory authority to conduct a criminal investigative stop and in part on the constitutional limits that Article I, section 9, imposes on that authority. *See generally Watson*, 353 Or at 775-81 (explaining evolution of the "reasonable suspicion" standard in Oregon). In the first two decades that followed the enactment of the statutes in 1973, this court addressed the statutory authority for investigatory stops, rather than the limits of Article I, section 9. *Id.* at 777; *see, e.g.*, *State v. Belt*, 325 Or 6, 932 P2d 1177 (1997); *Ehly*, 327 Or 66; *State v. Lichty*, 313 Or 579, 835 P2d 904 (1992); *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981); *Valdez*, 277 Or 621. However, in 1997, the

legislature enacted ORS 136.432, which limited the ability of courts to exclude evidence as a remedy for violations of statutes such as ORS 131.615. *See Watson*, 353 Or at 777-78 (so explaining). Since then, defendants who seek to exclude evidence derived from stops based on reasonable suspicion have invoked the prohibition against unreasonable seizures in Article I, section 9. *Id.* A handful of those later cases that concern the reasonable-suspicion standard have made their way to this court for decision. *See Holdorf*, 355 Or 812; *Watson*, 353 Or 768; *Fair*, 353 Or 588. But as a result of that history, this court has decided relatively few cases since the 1969 *Cloman* decision that specifically address the constitutional dimensions of the reasonable-suspicion standard.

While recognizing the statutory limitation in ORS 131.615(1) that permitted police officers to stop a person for investigation only if they had reasonable suspicion that the person had committed a crime, *see, e.g.*, *Valdez*, 277 Or at 625 n 4 (so explaining under earlier version of ORS 131.615(1), this court has stated that the analysis of a defendant's statutory rights "is substantially the same as analysis of his rights under the search and seizure provisions of the Oregon and Federal constitutions," given that the purpose of the statutes "is to protect interests of the kind which are protected by the Fourth Amendment of the United States Constitution and by Article I, § 9 of the Oregon Constitution." *Kennedy*, 290 Or at 497 (a case involving the defendant's consent to a search after he was stopped at the airport based on suspicion that he was carrying illegal drugs). And in 2014, in *Holdorf*, this court reiterated that principle in analyzing whether Article I, section 9, required exclusion of evidence derived from a stop in which the officer suspected that the defendant, a passenger during a traffic stop, had committed or was about to engage in drug crimes. 355 Or at 818-19.

We acknowledge that this court has articulated the reasonable-suspicion standard slightly differently at times, as the standard has evolved. As noted, the court's first decision, in 1969, was *Cloman*. In that case, this court drew on federal analysis of the Fourth Amendment to the United States Constitution, starting with *Rios v. United States*, 364 US 253, 262, 80 S Ct 1431, 4 L Ed 2d 1688 (1960), to decide for the first time as a matter of state constitutional law that

a temporary investigative stop by police must be grounded on "reasonable suspicion." 254 Or at 6. The court's stated holding concerning investigative stops was that "the police can stop a car to determine the identity of the vehicle and its occupants if they have *a reasonable suspicion that the car or its occupants have a connection with criminal activity.*" *Id.* (emphasis added). Although the court then quoted a number of decisions of other courts, including one from the Ninth Circuit, the court did not expand on their significance. *See id.* at 7-9. This court explained that it was not "drastically broadening" the power of officers to stop a person without probable cause to arrest, given that an officer "must have reasonable grounds" for the action. *Id.* at 9.

In *Valdez*, this court's next decision concerning the reasonable-suspicion standard, the court considered the application of ORS 131.615, which had been enacted four years earlier. The court emphasized that the record must reflect information that can be objectively evaluated. The court quoted extensively from the Commentary to the Law Revision Commission Proposed Oregon Criminal Procedure Code, Final Draft and Report, to determine the Commission's intent in proposing what became ORS 131.615 and "statutory intent." 277 Or at 625-26. Among other things, the court noted that the Commentary stated that, to establish reasonable suspicion, *Terry* required an officer to identify "specific and articulable facts" that "indicate to the officer that there is *some type of criminal activity afoot and that this particular person is somehow involved.*" *Id.* at 626 (internal quotation marks omitted; emphasis in *Valdez*).

This court in *Valdez* did not expressly state that the Commission's understanding of *Terry* was correct or that those requirements—sufficient facts indicating that (1) "criminal activity was afoot" and (2) the defendant was involved—formed the standard for evaluating the reasonableness of an officer's belief that the defendant "has committed a crime" as required by ORS 131.615. But the court's analysis implied it. The state's evidence at the suppression hearing in *Valdez* was that (1) officers observed three men in a high-vice area of northeast Portland approach a car and the defendant put a brown paper bag in the trunk; (2) one of the officers believed that the defendant, an African

American, looked like "a typical [drug] pusher"; and (3) the defendant was neatly groomed and well dressed. *Id.* at 623. The court compared the "fund of suspicious activity" that the officers had in *Terry* and *Cloman* with the evidence before it that could be "objectively evaluated." *Id.* at 627. While acknowledging that experienced officers develop an instinct about criminal conduct, the court cautioned that instinct alone would not suffice to establish reasonable suspicion:

> "[I]nstinct and experience cannot, however, form the entire basis for 'reasonable suspicion,' because no practical control can be exercised over police by courts if, in the absence of any remarkable activity, the officer's instinct and experience may be used as the sole reason to justify infringement upon the personal liberty sought to be protected by the statute."

*Id.* at 628. The court concluded that the state had not established reasonable suspicion as required by ORS 131.615, reversed the Court of Appeals, and affirmed the trial court's decision to grant the defendant's motion to suppress evidence. *Id.* at 629.

This court's next decision, *Lichty*, came 15 years later in 1992 and, like *Valdez*, concerned the reasonableness of a stop under the statute. In *Lichty*, the court expressly stated the reasonable-suspicion standard, which it described as an "'objective test of observable facts,'" 313 Or at 584 (quoting *Valdez*, 277 Or at 628), in terms of facts giving rise to an inference that criminal activity was afoot, leaving the defendant's involvement implied:

> "If a police officer 'is *able to point to specific and articulable facts which give rise to the inference that criminal activity is afoot*, the officer has 'reasonable suspicion' and hence can stop the individual for investigation.' *State v. Valdez*, \*\*\* 277 Or at 626 (quoting the Commentaries from the Commission of the Proposed Oregon Criminal Procedure Code of 1972, which drafted ORS 131.615)."

*Id.* at 584 (emphasis added).

The following year, this court decided two cases concerning the standard for reasonable suspicion under ORS 131.615. In *Ehly*, when describing the standard, the court explicitly clarified the requirement that the facts must

give rise to a reasonable inference that the person stopped has committed a crime: "If a police officer is able to point to *specific and articulable facts that give rise to a reasonable inference that a person has committed a crime*, the officer has 'reasonable suspicion' and hence may stop the person for investigation." 317 Or at 80 (emphasis added). In *State v. Jacobus*, 318 Or 234, 239-41, 864 P2d 861 (1993), the court reiterated that facts and reasonable inferences are required, and then it returned to *Lichty* to finish its formulation of the reasonable-suspicion standard: Reasonable suspicion exists if "the *facts known at the time of the stop, combined with the inferences that the police officer reasonably drew* from those facts, were sufficient to give rise to 'reasonable suspicion' by the officer *that 'criminal activity was afoot.'*" *Id.* at 239 (quoting *Lichty*, 313 Or at 584 (emphasis added)).

Four years later, in 1997, this court returned to the statutory reasonable-suspicion standard in *Belt*. The court explained in *Belt* that, in light of ORS 131.615(1), "the issue of law presented is whether the information known to the officer at the time of the stop was sufficient as a legal matter to support a reasonable suspicion that defendant had committed the crime for which the officer stopped him for the purpose of making inquiry." 325 Or at 11. Reasonable suspicion exists, the court stated, if "*the evidence is legally sufficient to support an inference that an officer holds a subjective belief that is reasonable under the circumstances as to a specific defendant and crime.*" *Id.* at 14 (emphasis added). And, to address the reasonableness issue, a court must "review the officer's testimony at the suppression hearing" to determine "whether the officer pointed to specific and articulable facts that are sufficient as a matter of law to give rise to an inference that a reasonable officer would hold the required subjective belief." *Id.* at 12 (citing *Ehly*, 317 Or at 80). Thus, in its formulation of the standard, the court in *Belt* reemphasized that the statute required suspicion that the defendant had committed a crime.

Since 1997 and the enactment of ORS 136.432 (providing that, with exceptions, a court "may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision"), this court's decisions concerning

the reasonable-suspicion standard have addressed constitutional challenges to stops under Article I, section 9. In *Fair*, decided in 2013, the court addressed whether police may stop a potential material witness and the standard that must be met for doing so, which differs from the reasonable-suspicion standard applicable to individuals whom the police suspect of criminal activity. 353 Or at 609. *Watson*, the other post-1997 case also decided in 2013, involved a traffic stop, during which the officers developed reasonable suspicion that the defendant had drugs in the car. 353 Or at 784-85. This court explained the history of our cases concerning ORS 131.615 and the limited case law concerning constitutional limitations on police authority to stop a person under Article I, section 9, 353 Or at 775-81, but the case focused on whether actions taken by the police officers during the traffic stop were reasonably related to their investigation of the traffic infraction. *Id.* at 781-84.

As noted, *Holdorf* was decided in 2014 and is this court's most recent decision concerning the reasonable-suspicion standard. In its constitutional analysis of the reasonable-suspicion standard, this court in *Holdorf* concluded that common principles underlie decisions such as *Valdez*, *Lichty*, and *Ehly* and the constitutional limits on police authority in Article I, section 9. It summarized the common principles relevant to that case as follows:

> "The people have a liberty interest to be free from unreasonable searches and seizures that is protected by provisions of the Oregon and federal constitutions. The standard of 'reasonable suspicion' justifying a police intrusion on that liberty interest when a person is stopped was intended to be less than the standard of probable cause to arrest. A stop is unlawful unless it meets an objective test of reasonableness based on observable facts. Officer intuition and experience alone are not sufficient to meet that objective test. However, *if an officer is able to point to specific and articulable facts that a person has committed a crime or is about to commit a crime, the officer has a 'reasonable suspicion' and may stop the person to investigate.*"

*Holdorf*, 355 Or at 822-23 (emphasis added).

In applying those principles concerning the reasonable-suspicion standard, the court further explained

that the objective review of the basis for a stop "looks to the totality of the circumstances confronting a police officer and not just those circumstances that directly relate to a suspect or are personally observed by the police officer stopping a suspect." *Id.* at 824; *accord Belt*, 325 Or at 13 (in determining whether an officer had "reasonable suspicion," a court must first look to the officer's actual belief, and then evaluate whether that belief was objectively reasonable under the totality of the circumstances). Thus, in some circumstances, a police officer may rely on information provided by others in determining whether a stop is justified by reasonable suspicion. *Holdorf*, 355 Or at 824-25.

        The facts in *Holdorf* also raised the additional issue of how to evaluate an officer's testimony concerning his experience as a police officer—in that case, experience with methamphetamine use by criminal suspects. *Id.* at 826-27. The court concluded, based in part on *Valdez*, *Lichty*, and *Ehly*, that "a police officer's training and experience may, depending on the factual circumstances, *** be given appropriate weight" by a court in its objective review of the basis for an investigatory stop of the defendant. *Id.* at 829. But, the court emphasized,

> "a police officer's training and experience, as relevant to proving particular circumstances, is not presumed based solely upon a police officer's employment status. Rather, that training and experience must be established, as it was here, through admissible evidence of specific articulable facts that permit an officer to make a reasonable inference based on the officer's pertinent training and experience."

*Id.*

        As that history of the case law establishes, the variable parts of the standard for reasonable suspicion are (1) the nature or specificity of the inference that justifies the stop, both as to the kind of illegal activity suspected and the defendant's involvement in it, and (2) the kind and quantum of evidence required to establish that inference. In this case, the state expressly or implicitly challenges both parts of the reasonable-suspicion standard as the Court of Appeals articulated and applied it.

In regard to the defendant's suspected illegal conduct, the state argues that the Court of Appeals incorrectly evaluated the officers' suspicion of *specific* crimes, including criminal mischief, menacing, and assault. The state argues that the officers had reasonable suspicion because the totality of the circumstances suggested that other, more general, "criminal activity" could have occurred.[3] We reject the proposition that an officer need not subjectively suspect the defendant's crimes with any specificity, as the state's argument suggests.

That position is inconsistent with the requirement that an officer identify "specific and articulable facts" linking the defendant to criminal activity, as well as the requirement that an officer's belief be objectively reasonable so as to prevent "arbitrary" intrusions into individual privacy. *Fair*, 353 Or at 602. An officer cannot articulate sufficiently specific facts to satisfy Article I, section 9, if the officer cannot articulate, with at least *some* specificity, what type of crime that the person stopped may have committed. *See Valdez*, 277 Or at 628 (an officer's "instinct and experience cannot, however, form the entire basis for 'reasonable suspicion,' because no practical control can be exercised over police by courts if, in the absence of any very remarkable activity, the officer's instinct and experience may be used as the sole reason to justify infringement upon the personal liberty sought to be protected by the statute"). We have not identified any case in which this court has held that an officer's subjective suspicion of generalized "criminal activity" was sufficiently specific or objectively reasonable to satisfy Article I, section 9, for a stop of a particular individual. Although four of the pre-1997 cases (*Jacobus*, *Lichty*, *Valdez*, and *Cloman*) state that there must be an inference of "criminal activity" or of criminal activity "afoot," in all of those cases, the court reviewed whether it was reasonable to infer that the defendant had committed specific crimes or types of crimes. *See Jacobus*, 318 Or at 241 (conspiracy or attempt to commit robbery or theft); *Lichty*, 313 Or at 584-85 (possession of

---

[3] On review, the state now argues that perhaps "criminal activity of a domestic violence nature" was occurring, but the state did not make that argument in the Court of Appeals. And, the record contains no evidence that the officers suspected defendant of domestic violence.

cocaine); *Valdez*, 277 Or at 628-29 (drug crimes); *Cloman*, 254 Or at 10 (theft).

Thus, the better and specific formulation of the required inference in a case based on the defendant's illegal conduct (as opposed to the defendant's potential to be a material witness, as discussed in *Fair*)—as provided in *Ehly*, *Belt,* and *Holdorf*—is that the officers must reasonably suspect that the defendant has committed or is about to commit a specific crime or type of crime. A specific type of crime, for example, can be criminal mischief, assault, theft, or kidnapping, with the differences in the degrees of the crimes being immaterial to whether the officers have reasonable suspicion. Another set of examples of a specific type of crime is the possession or the delivery of a controlled substance. In those cases, the difference between whether the substance is cocaine rather than methamphetamine is also immaterial to the analysis of reasonable suspicion.[4]

As for the inference concerning defendant's involvement, the state argues that the Court of Appeals erred by concluding that the stop was justified only if the officers reasonably concluded that defendant had committed a crime, as opposed to perhaps witnessing criminal activity. Rather, the state contends, reasonable suspicion requires only that the officer reasonably believe that the defendant is "somehow involved with whatever criminal activity may have been occurring." The state's position is problematic on two fronts.

First, in this case, both officers testified that they actually believed that defendant was Wilson and that he had committed a crime—not that he was a potential witness to a crime.[5] Accordingly, the Court of Appeals properly focused on whether the officers reasonably suspected that defendant at least had committed some type of crime.

---

[4] We do not intend those few examples to constitute a limit on the types of crimes that may be the focus of an officer's stop.

[5] The state relies on *Fair*, in which this court held that, "in appropriate circumstances, it is permissible under Article I, section 9, for officers to stop and detain someone for on-the-scene questioning whom they reasonably suspect can provide material information about a crime's commission." 353 Or at 608. The state has raised the possibility that defendant could have been a witness to a crime for the first time in this court, and we do not consider how that circumstance and the rule in *Fair* would apply, given the officers' testimony about their subjective beliefs about defendant's involvement as a crime suspect in this case.

Second, as with the state's argument concerning the specificity of the suspected illegal conduct required for reasonable suspicion, the state's position is inconsistent with the rule that reasonable suspicion requires a showing of "specific and articulable facts" justifying an officer's intrusion into someone's privacy, which in turn allows meaningful judicial review of the reasonableness of the officer's seizure of that person. Although this court's decisions have sometimes worded the requirement loosely, as the state notes by citing *Valdez*, 277 Or at 626 (requiring an inference that the person stopped "is somehow involved" in criminal activity), all the cases discussed above concerning a defendant's suspected perpetration of a crime consistently require that the evidence must support an inference that the defendant either has committed or is about to commit a crime. *See, e.g.*, *Holdorf*, 355 Or at 829-30 (suspicion that the defendant, who was in a car with a known felon under investigation for participation in a methamphetamine distribution ring, and who appeared to be under the influence of the drug, possessed the drug); *Ehly*, 317 Or at 79-81 (suspicion that the defendant, who was rummaging in a duffel bag, was a felon in possession of a firearm).

Thus, we reject the state's position that the officer need not actually and reasonably suspect that the individual committed or is about to commit a specific crime or type of crime—and need only suspect the individual of general "criminal activity." When an officer's suspicion reduces to that level of generality, such a rule would permit an officer to stop an individual whenever the officer believes that the person appears to be a criminal or that something about a situation seems "criminal." But this court has never concluded that an officer had reasonable suspicion to stop an individual based on nonspecific "criminal activity." *See, e.g.*, *Jacobus*, 318 Or at 241 (officer reasonably suspected that the defendant's criminal activity included robbery and theft); *Lichty*, 313 Or at 585 (officer reasonably suspected that the defendant possessed cocaine and "therefore was committing a crime"). Moreover, this court has specifically rejected officer intuition alone as sufficient to establish reasonable suspicion. *Holdorf*, 355 Or at 823; *Valdez*, 277 Or at 628.

In sum, the standard for "reasonable suspicion" required to support the lawfulness of an investigative stop of a person suspected of criminal conduct is well-established. For police officers to make a stop, they must reasonably suspect—based on specific and articulable facts—that the person committed a specific crime or type of crime or was about to commit a specific crime or type of crime. For a court to determine that an investigative stop was lawful under Article I, section 9, the court (1) must find that the officers actually suspected that the stopped person had committed a specific crime or type of crime, or was about to commit a specific crime or type of crime, and (2) must conclude, based on the record, that the officers' subjective belief—their suspicion—was objectively reasonable under the totality of the circumstances existing at the time of the stop. *See, e.g., Holdorf*, 355 Or at 825; *Ehly*, 317 Or at 79-80.

Turning to the kind of evidence required to establish the lawfulness of a stop, because the officers in this case believed only that defendant may have committed a crime in Velek's house, we limit our discussion to the evidence needed to support an officer's belief that the defendant may have committed a crime. All this court's cases after *Cloman* have consistently required the state to establish the "specific and articulable facts" that led the officer to actually and reasonably believe that the defendant may have committed a crime or type of crime. The state agrees that an officer must be able to point to "specific and articulable facts" giving rise to the officer's belief. But, the state emphasizes that a court reviewing the lawfulness of a stop must consider whether the "totality of the circumstances" suggested that criminal activity was afoot and now relies on a theory that defendant may have committed domestic violence crimes, backed by cases from other jurisdictions concerning suspected domestic violence crimes. In making that argument, the state implies that an appellate court may review a stop for whether there was any possibility that any crime may have been committed. In other words, the state suggests that we can affirm the trial court's denial of defendant's motion to suppress apart from the officers' testimony about the factual circumstances leading to the stop and the crimes that they suspected that defendant had committed when they

made the stop, which specifically did not include domestic violence, and apart from the state's arguments founded on that evidence at the suppression hearing.

We reject the state's suggestion. A court's review of a stop is based on the record made concerning the officer's actual belief that the defendant may have committed a crime, *see Ehly*, 317 Or at 79, and the basis for that belief—the specific facts, articulated by the officer, that led him or her to believe that the defendant may have committed a crime, which we then review as a matter of law for objective reasonableness, *see Belt*, 325 Or at 12 (stating that, to address reasonableness, a court reviews "the officer's testimony at the suppression hearing" to determine "whether the officer pointed to specific and articulable facts that are sufficient as a matter of law to give rise to an inference that a *reasonable* officer would hold the required subjective belief" (emphasis in original)).

Finally, as for the quantum or degree of certainty required for the officers to reasonably suspect that the person stopped has committed a crime, the state takes issue with the Court of Appeals' phrasing of its holding: "[T]he facts known to the officers at the time of the stop * * * were not sufficient to support an objectively reasonable *conclusion* that a crime had occurred." *Maciel-Figueroa*, 273 Or App at 305 (emphasis added). "Reasonable suspicion," the state argues, does not require that an officer *conclude* with certainty that a crime has occurred or is about to occur. Rather, it argues, the officer must identify specific and articulable facts that support an *inference* of criminal activity. *See Lichty*, 313 Or at 584 (reasonable suspicion exists when police officer "is able to point to specific and articulable facts which give rise to the inference that criminal activity is afoot") (internal quotation marks and citations omitted).

We agree that "reasonable suspicion" does not require an officer to *conclude* that the defendant has committed a crime, in the sense that the verb "conclude" connotes reaching a final decision or judgment that something is certainly true. The term "reasonable suspicion" itself conveys that nuance; in its ordinary usage, "suspicion" means a feeling or belief that something is true, rather than an

objective certainty. However, an officer's subjective belief must be "objectively reasonable"; thus, as the state identifies, the standard for "reasonable suspicion" requires that the articulated facts that formed the basis for the officer's suspicion give rise to a reasonable *inference* that the defendant has committed or is about to commit the crime that the officer suspects. *See Holdorf*, 355 Or at 822; *Ehly*, 317 Or at 80; *Lichty*, 313 Or at 584; *Valdez*, 277 Or at 626. In sum, the state need not prove that the articulated facts give rise to a conclusion with certainty that a crime has occurred or is about to occur; instead, based on the specific facts known and articulated by the officer, a reviewing court must conclude that the officer's subjective belief *could* be true, as a matter of logic. *See Belt*, 325 Or at 13.

B.  *Application*

As we emphasized at the outset, the record establishes that the *only* facts known to the officers at the time of the stop were that defendant was a male whom they had seen walking down the driveway from Velek's home and then walking away from the house; approximately 10 minutes earlier, they had received a "disturbance call"; and, the information in that call was that Velek's mother had reported that a named man, Wilson, was inside Velek's house, yelling and threatening to break things. Two key factual inferences are at issue in this case: (1) defendant was Wilson, the subject of the report, and (2) Wilson had committed a crime in Velek's house. Although the facts support the first inference, they do not support a reasonable inference that Wilson had committed the crimes that the officers suspected, as a matter of logic.

Initially, we conclude that the facts articulated by the officers supported their belief that defendant could be Wilson. Although the officers lacked identifying information about Wilson from the call, the spatial and temporal connection between defendant and the house where the disturbance occurred sufficed. Defendant was male and was walking down the driveway from Velek's home minutes after the report from Velek's mother. Although defendant might have departed the front of the house after approaching for an innocent reason, without ever having been inside, the officers

knew the layout of the house and reasonably inferred that he had come from the front entrance and, therefore, that he could have just come out of the house and been Wilson.

The officers articulated three crimes that they believed that defendant might have committed. As noted, Moffitt testified that he believed that defendant "may have been involved with the disturbance" at Velek's house, which he believed may have been a crime related to "yelling and threatening to break things at the home." Welsh initially testified that he believed, generally, that "maybe a crime had been committed" and that "there was probably something going on," which "could be anything" related to "threatening to start destroying stuff." Later, Welsh's testimony specified that defendant's possible crimes could have included criminal mischief, menacing, and assault. Some of the officers' testimony suggested that their suspicion mostly reduced to their intuition that defendant had done something wrong. But, to the extent that the officers did subjectively believe that defendant had committed specific crimes, the Court of Appeals properly tethered its analysis to the range of crimes that the officers articulated. *See Belt*, 325 Or at 13.

In examining the evidence in the record, the Court of Appeals reasoned that the lone fact that someone yelled and threatened to break things did not give rise to a logical inference that that person *actually* broke things, and the officers did not hear anything or observe anything else about defendant that suggested that he had been destroying Velek's property in her house. *See Maciel-Figueroa*, 273 Or App at 307. And with no further information in the record, the court explained that the facts that the officers articulated were even less supportive of logical inferences that defendant had physically harmed or threatened to harm Velek or another person. *Id.* We agree with that analysis, which, contrary to the state's argument, does not place a burden on officers to show conclusive proof of a crime at the time of the stop, as the state contends. We emphasize that the record was devoid of evidence concerning training that police officers have concerning "disturbance" calls or the officers' experience responding to such calls, and so the prosecutor could not argue that information of that type,

coupled with what the officers knew through the call and their observations on the street, would support an inference that defendant had assaulted or threatened to harm Velek or had destroyed her property. Moreover, although the officers knew the house and Velek from previous contacts, no testimony tied those contacts to any reasonable inference they could have drawn relating to defendant. It is apparent that the circumstances aroused the officers' suspicion, but the record did not contain sufficient specific and articulable facts—evidence that can be objectively evaluated, *Valdez*, 277 Or at 626—that would support an inference that defendant had committed a crime.

As we have reiterated in this opinion, "reasonable suspicion" under Article I, section 9, requires that an officer be able to point to specific and articulable facts that support the officer's belief that the person stopped may have committed or may be about to commit a specific crime or specific type of crime, and the key question is whether the officer's subjective belief is objectively reasonable, given the facts in the record. The Court of Appeals properly applied those settled standards in this case.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.