Argued and submitted January 27, reversed and remanded November 12, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STANLEY GLEN SHERMAN,
*Defendant-Appellant.*

Lincoln County Circuit Court
122786; A154427

362 P3d 720

Ernest G. Lannet, Chief Deputy Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Pamela Johnstone Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

On appeal from a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, defendant assigns error to the trial court's denial of his motion to suppress. Defendant concedes that police officers stopped him lawfully to investigate possible criminal activity, but he contends that officers unlawfully extended that stop past the point at which the justification for it dissipated, thereby effecting an unlawful seizure. Defendant further contends that a police officer obtained the evidence in question through exploitation of that unlawful seizure and the trial court should, therefore, have granted his suppression motion. We agree. Accordingly, we reverse and remand.

Except as noted below, we state the facts consistently with the trial court's explicit and implicit factual findings that the record supports. *State v. Culley*, 198 Or App 366, 374, 108 P3d 1179 (2005). At approximately 2:30 a.m., the Lincoln City Police Department received a report that a man was shining a flashlight into vehicles parked at an apartment complex. A few minutes later, the caller reported that the man was leaving the parking lot in a silver Chevrolet Cavalier. Officer Dodds was patrolling the area when he saw a silver Cavalier within one block of the apartment complex. When the driver failed to stop behind a marked stop line at an intersection, Dodds activated his overhead lights, initiating a traffic stop.

Defendant's son Levi was driving the car and defendant, who owned the car, was in the front passenger seat.[1] Dodds explained that he was investigating both "the possible car clouts [and] *** the failure to stop at the stop sign" and described the report that he had received. Defendant told Dodds that the man in the parking lot with the flashlight "was him" and explained that he "was just going to use the bathroom and was making his way back to their vehicle ***."[2]

---

[1] Both parties refer to defendant's son as "Levi" in their briefs; we do the same in this opinion to avoid confusion with defendant, who has the same last name.

[2] The trial court mistakenly found that Levi told Dodds that the report from the named caller referred to him (Levi). However, the record does not support

Dodds discovered that Levi's driver's license had been suspended and told Levi that he was under arrest for driving while suspended. Dodds intended to cite and release Levi, and to allow defendant to drive the car home.

Sergeant Weaver arrived at the scene shortly after the stop and began to act as a cover officer for Dodds. Weaver assisted Dodds in arresting Levi and placing him in the back of Dodds's patrol car. Weaver, who had extensive experience as a narcotics officer, saw what appeared to be scabbed injection sites on Levi's arms that were consistent with intravenous methamphetamine use.

While Dodds processed Levi's arrest paperwork in his patrol car, Weaver went to the passenger side of defendant's car and spoke with defendant, who remained in the passenger seat. Weaver, who was continuing to investigate potential car prowls, asked for defendant's name and date of birth, checked his information, and found no indication of criminal activity. Weaver described the conversation with defendant as "very low key." Weaver looked in the car through the windows for anything dangerous or related to potential car prowls, and he noticed a butane torch behind the driver's seat on the back floorboard. Weaver described the torch as "not huge"; such torches usually are "about six, seven inches" and have a metal tube where the flame comes out, linked by a valve assembly to a bottle of butane or propane. Weaver knew that people frequently use such torches in conjunction with smoking methamphetamine; he also knew that the torches may be used for other purposes.

Weaver also saw a small, black bag on the driver's side floorboard. He asked defendant for consent to search the bag. Defendant replied, "Yeah, that's not a problem." Weaver retrieved the bag from the vehicle and examined its contents. As he explained at the suppression hearing, Weaver found the bag's contents—binoculars, two-way radios, and make up—to be "weird" and "curious," but he did not view

that finding; to the contrary, defendant and the state agree on appeal, and their agreement is supported by Dodds' testimony before the trial court, that it was defendant who told Dodds that the caller's report referred to him (defendant) and who was, therefore, the primary subject of the criminal investigation into possible car prowls.

those items or anything else he saw as "anything that was like, okay, this could be theft."

A third officer, Bledsoe, arrived as additional backup while defendant and Weaver were talking. After Bledsoe arrived, Weaver asked defendant for permission to search the car, and defendant consented. Weaver asked defendant to step out of the car and continued to speak with defendant while Bledsoe searched the vehicle. Defendant told Weaver that he and Levi had just dropped off Levi's girlfriend at her parents' apartment. By then, Bledsoe had finished searching the car. He did not find any evidence of criminal activity.

At that point, Weaver testified, defendant would have been free to leave. However, Weaver did not tell defendant that he could leave. Rather, he continued to converse with defendant, asking him if Levi and his girlfriend had "some kind of a drug thing going on." Defendant indicated that both Levi and his girlfriend had a "problem" with methamphetamine. Weaver then noticed that defendant also had marks consistent with intravenous methamphetamine use on his arms. Weaver asked defendant about his arrest history, and defendant responded that he had been arrested four years earlier for possession of methamphetamine.

Weaver then asked defendant, "Is there anything on you I should be worried about?" to which defendant replied, "No." Weaver acknowledged at the suppression hearing that he had not believed that defendant possessed a weapon or posed a danger to Weaver or anybody else present. Nonetheless, Weaver asked to search defendant's person to determine whether he possessed illegal drugs. Defendant consented. However, instead of waiting for Weaver to conduct a search, defendant emptied his pockets, placing items on the ground in front of Weaver and immediately stepping backwards. In Weaver's experience, people who empty their own pockets after consenting to a search are typically trying to prevent the police from discovering something concealed on their person, so Weaver asked to search defendant himself, which defendant allowed.

Weaver patted the front coin pocket of defendant's pants and felt something "mushy" that, in his experience, was consistent with a small bag of methamphetamine.

Weaver removed the item from defendant's pocket. Defendant admitted that it probably contained methamphetamine, and Weaver arrested him.

At no point during the encounter did the officers make demands of defendant or use threats or promises to gain defendant's consent to search. Nor did the officers point their weapons at defendant or otherwise threaten him. However, although Weaver later testified that defendant could have left the scene, the officers never told defendant that their initial suspicion of possible criminal activity had abated or that he was free to leave.

The state charged defendant with unlawful possession of methamphetamine. Defendant moved to suppress the methamphetamine discovered in his pocket, as well as his subsequent statements. He argued that, by the time Weaver asked for consent to search defendant's person, any reasonable suspicion of potential car prowls had abated and Weaver did not have enough information to support reasonable suspicion of drug possession. Therefore, defendant argued, Weaver's request for consent to search constituted an illegal seizure under Article I, section 9, of the Oregon Constitution and evidence found as a result of that seizure should be suppressed.

The trial court denied defendant's motion. The court first ruled that Weaver's request for consent did not unlawfully extend the seizure, because it occurred during an "unavoidable lull" in the processing of Levi's arrest. Alternatively, the court reasoned that Weaver "had reasonable suspicion at the time he requested consent to search Defendant's person that Defendant was in possession of controlled substances." After the court issued a written order denying defendant's suppression motion, defendant entered a conditional guilty plea that reserved his right to appeal the suppression issue.

On appeal, defendant concedes that the officers acted lawfully in stopping the car and investigating possible criminal activity—car prowling—but he renews his argument that the stop was unlawfully extended past the point at which reasonable suspicion of that criminal activity had dissipated. Specifically, defendant contends that Weaver's

request to search defendant's person "was made during an unlawful extension of the stop, because Weaver lacked an objectively reasonable basis to suspect that defendant possessed methamphetamine." Defendant concludes that suppression was required because Weaver discovered the evidence at issue by searching defendant during the course of an unlawful seizure.

The state responds that the officers detained defendant for a reasonable period of time to investigate the reported criminal activity, suggesting that defendant's seizure ended when Weaver and Bledsoe stopped their investigation into possible car prowls. In the state's view, the officers then engaged defendant in "mere conversation," during which defendant voluntarily consented to the subsequent searches. Further, the state argues that, even if the initial seizure was unlawfully extended, the officers' discovery of the evidence was sufficiently attenuated from that illegality because defendant's consent to search was voluntary.

We begin our analysis by considering (1) whether defendant was seized within the meaning of Article I, section 9, (2) if so, at what point in time, and (3) whether any such seizure was lawful. In doing so, we are bound by the trial court's factual findings to the extent that the record supports them, and we review the trial court's conclusions of law for legal error. *State v. Williams*, 191 Or App 270, 272, 81 P3d 743 (2003).

Article I, section 9, guarantees that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" A constitutionally significant seizure occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis in original). One type of seizure is a "stop," which involves a temporary restraint of a person's liberty for investigatory purposes—a lesser restraint on the person's liberty than an arrest. *See State v. Fair*, 353 Or 588, 593, 603, 302

P3d 417 (2013) (describing stops as "temporary detentions for investigatory purposes" and observing that "the intrusion" on the detainee's liberty is less during a stop than it is during an arrest). A "stop" must be justified by "necessities of a safety emergency or by reasonable suspicion that the [stopped] person has been involved in criminal activity." *Ashbaugh*, 349 Or at 308-09.

In contrast to a stop or arrest, a noncoercive encounter—or "mere conversation"—between police officers and other individuals is not a seizure and it requires no justification. *Id.* Differentiation between a "stop" and a constitutionally insignificant "mere conversation" requires a fact-specific inquiry into the totality of the circumstances. *State v. Paskar*, 271 Or App 826, 833, 352 P3d 1279 (2015) (citing *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013)). That inquiry focuses on whether the officer's "conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens." *Backstrand*, 354 Or at 400.

In arguing that he was seized throughout his interaction with the officers, defendant challenges the trial court's analysis as applied to him, a passenger in the vehicle. He asserts that the trial court erred "in limiting its analysis to that of a conventional 'traffic stop' focused on the driver"— that is, in analyzing the lawfulness of the officers' interactions with *defendant* by considering whether they occurred during an unavoidable lull in processing *Levi's* arrest.

We agree with defendant that our analysis must focus on the stop of defendant, not on the stop of Levi. "[W]e analyzed whether a passenger had been unlawfully seized during the course of a traffic stop as a question separate from the stop of the driver." *State v. Knapp*, 253 Or App 151, 154, 290 P3d 816 (2012), *vac'd on other grounds*, 356 Or 574, 342 P3d 87 (2014).[3] A passenger is not automatically

---

[3] After we determined, in *Knapp*, that police officers had unlawfully detained the defendant passenger, we then analyzed, under *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), whether the defendant was entitled to have evidence suppressed

seized during a stop, "but a 'further exercise of coercive authority over the passenger[] by officers may, in certain circumstances, constitute a seizure.'" *State v. Ross*, 256 Or App 746, 750, 304 P3d 759 (2013) (quoting *State v. Thompkin*, 341 Or 368, 377, 143 P3d 530 (2006)). For example, in *Knapp*, police officers initiated a traffic stop to investigate a violation that the driver had committed as well as a seat belt infraction committed by the passenger—the defendant. We concluded that the defendant could challenge the constitutionality of the stop, "not merely because he was a passenger in an unlawfully stopped car, but because he himself had been seized by a police show of authority *directed at him*." *Id.* (emphasis added). Therefore, the correct focus of the inquiry regarding whether a passenger was seized under Article I, section 9, is whether the police "show of authority" was constitutionally significant as directed at the passenger.

On appeal, the state does not dispute that defendant was seized when Dodds pulled the vehicle over and told defendant and Levi that he was investigating a report of possible car prowls. Instead, the state challenges defendant's contention that defendant remained seized during the entire encounter with the officers, arguing that, after the officers finished searching defendant's car, their seizure of defendant ended and the further interaction between Weaver and defendant was "mere conversation."

We disagree. Defendant was subjected to a consistent show of authority by the officers throughout the encounter, with no apparent break in his detention. Specifically, and unlike in cases involving defendants who were merely bystanders to stops directed at other occupants of a vehicle, defendant knew that *he* was the subject of the investigation into possible car prowls. The officers searched his black bag and his car in association with that investigation. The

based on that illegality. 253 Or App at 156. The Supreme Court subsequently vacated our decision in *Knapp* for reconsideration of that latter "exploitation" question in light of *State v. Unger*, 356 Or App 59, 333 P3d 1009 (2014); *State v. Lorenzo*, 356 Or App 134, 335 P3d 821 (2014); and *State v. Musser*, 356 Or App 148, 355 P3d 814 (2014). However, the Supreme Court's decision in *Knapp* does not call into question this court's analysis of the underlying stop issue, and we adhere to our discussion in *Knapp* of the appropriate analysis for determining when a passenger in a stopped car is seized.

record contains no evidence suggesting that defendant had any reason to know that the officers did not view the items they found in the search as evidence of criminal activity.

Moreover, the surrounding circumstances would not have indicated to defendant that the investigation into possible car prowls had concluded. Specifically, Weaver continually asked defendant probing questions throughout the encounter, never indicating that he had concluded the car-prowl investigation or that defendant was free to leave. In addition, Weaver stayed outside defendant's door or by his side throughout the encounter, three officers and three patrol cars were at the scene at about 2:40 a.m., and the overhead lights on Dodds's patrol car remained activated. That persistent show of authority—continuing after what indisputably began as a criminal investigation—would lead a reasonable person, at whom the authority was directed, to believe that he was the subject of an ongoing criminal investigation and was not free to leave. Thus, defendant was subject to a seizure throughout the encounter.

The trial court held, as an alternative basis for denying defendant's suppression motion, that the officers had reasonable suspicion that defendant possessed controlled substances. We turn to that question, *viz.*, whether the ongoing seizure of defendant was justified by reasonable suspicion of criminal activity, as Article I, section 9, requires. *State v. Rodgers/Kirkeby*, 347 Or 610, 621, 227 P3d 695 (2010).

> "The reasonable suspicion standard has a subjective component—that is, the officer must subjectively suspect that a person has committed a crime—and an objective component—that is, the officer must identify specific and articulable facts from which he or she formed an objectively reasonable suspicion that a person has committed or is about to commit a crime."

*State v. Kentopp*, 251 Or App 527, 532, 284 P3d 564 (2012).

Here, defendant does not dispute that the stop and detention were, at the outset, supported by reasonable suspicion that defendant was stealing or attempting to steal items from cars. Rather, he contends that, when the officers' suspicion of that crime dissipated, they had not yet developed

reasonable suspicion that he possessed methamphetamine. Defendant's argument implicates a principle that is repeatedly discussed in our recent cases: Even when a stop initially is lawful, it may endure only for the time it takes an officer to complete an investigation that is reasonably related to the basis for the stop. *See Rodgers/Kirkeby*, 347 Or at 626 (in context of traffic stop, an officer's "authority to detain defendant evaporated" once the officer "had completed the investigation reasonably related to the traffic infraction and issuance of the citation"); *State v. Kimmons*, 271 Or App 592, 599, 352 P3d 68 (2015) (applying *Rodgers/Kirkeby* where initial stop was for criminal investigation, not traffic infraction). Thus, a "stop that begins lawfully can become unlawful when the reason for the stop has dissipated." *State v. Berringer*, 234 Or App 665, 669, 229 P3d 615 (2010). If a stop extends past that point, it must be justified by at least reasonable suspicion of some other criminal activity. *Kentopp*, 251 Or App at 534; *State v. Klein*, 234 Or App 523, 532, 228 P3d 714 (2010).

Accordingly, we must answer three questions in determining whether reasonable suspicion supported the stop of defendant through the point at which officers took steps that led to discovery of the evidence that defendant seeks to suppress: (1) When, if ever, did Weaver's reasonable suspicion that defendant was committing or attempting to commit car prowls dissipate? (2) What facts were known to Weaver at that point? (3) As a matter of law, did those facts give Weaver reasonable suspicion that defendant possessed methamphetamine? We consider each question in turn.

The resolution of the first issue, when reasonable suspicion of possible car prowls abated, is simple because the state acknowledges that Weaver's reasonable suspicion dissipated after Bledsoe searched defendant's vehicle. As the state puts it: "After the officers searched defendant's car and found nothing related to car clouts, they ended the criminal investigation and defendant was free to leave." We conclude that reasonable suspicion of possible car prowls abated when the search of defendant's car was complete.

We turn to the second question, which requires us to determine what facts were available to Weaver when he

extended the stop past that point. Our review of the record—viewing the facts in the light most favorable to the state—reveals that Weaver had only scanty pertinent information at that time: he had observed the butane torch in defendant's vehicle and had seen marks on Levi's skin consistent with methamphetamine use. True, Weaver could permissibly draw on his training and narcotics-investigation experience in evaluating those facts; he observed at the suppression hearing that the butane torch was "very consistent with * * * people using methamphetamine." Nonetheless, for the reasons that follow, we conclude that those facts and observations did not give Weaver objectively reasonable suspicion that defendant possessed methamphetamine.

We previously have held that the presence of a butane torch, without more, does not give an officer reasonable suspicion of criminal activity. *State v. Gomes*, 236 Or App 364, 369, 236 P3d 841 (2010) ("[An officer's] suspicion * * * based solely on having learned from his 'training and experience' that the presence of a butane cigar or cigarette lighter * * * are consistent with drug use, was not a *reasonable* suspicion without additional suspicious facts." (Emphasis in original.)). As Weaver acknowledged, butane torches are not exclusively used for drug ingestion. Specifically, defense counsel asked Weaver, "[I]s it illegal to have these little torches?" and he responded, "No." Further, when defense counsel asked if there "are other uses for these torches beside [drug use]," Weaver answered, "Yes, absolutely." And here, Weaver identified no other drug paraphernalia that could have linked the torch found in defendant's vehicle to methamphetamine use or possession. Moreover, the record contains no evidence suggesting that the butane torch had been used recently.

Only one other pertinent fact contributes to the totality of the circumstances we evaluate when considering whether Weaver reasonably suspected that defendant possessed methamphetamine: Weaver's suspicion that Levi was a methamphetamine user. But mere association with a drug user, without more, generally is not sufficient to establish reasonable suspicion. *State v. Clink*, 270 Or App 646, 651, 348 P3d 1187, *rev den*, 358 Or 69 (2015); *State v. Zumbrum*, 221 Or App 362, 369, 189 P3d 1235 (2008) ("The mere fact

that a person associates with another person involved with methamphetamine does not support a reasonable suspicion that that person is also involved in methamphetamine.").

Thus, the totality of the circumstances known to Weaver at the pertinent time amount to the presence of one item consistent with—but not exclusively associated with—methamphetamine use (the butane torch) and evidence that defendant's companion, his son, was a methamphetamine user. "Reasonable suspicion is a less demanding standard than probable cause," *State v. Hames*, 223 Or App 624, 628, 196 P3d 88 (2008), but it demands more than that. In the absence of any information suggesting that either defendant or Levi was under the influence of methamphetamine or another controlled substance, that either man possessed any other items or had engaged in any behavior that indicated recent drug use or possession, or that either man had been involved in any other sort of ongoing drug crime, like manufacture or distribution of controlled substances, the circumstances here do not establish reasonable suspicion of criminal activity. *Cf. Kentopp*, 251 Or App at 532-33 (the defendant's nervousness, in combination with demeanor and appearance that suggested past drug use, did not give an officer reasonable suspicion to investigate the defendant for drug possession).

Comparison with other cases makes the point. Consider, for example, *State v. Holdorf*, 355 Or 812, 333 P3d 982 (2014). In that case, the defendant was in a car with a person whom a police officer recognized as the subject of an investigation into a local methamphetamine distribution ring, the car in which the defendant was a passenger was associated with a prior drug deal, and the defendant appeared to be under the influence of drugs at the time he was stopped. The totality of those circumstances gave the officers reasonable suspicion that the defendant possessed contraband. *Holdorf*, 355 Or at 812. *State v. McHaffie*, 271 Or App 379, 350 P3d 600 (2015), provides another useful comparison. In that case, officers had reasonable suspicion of criminal activity because the defendant was associated with a known drug user, had used methamphetamine in the past, showed signs of current intoxication, *and* was engaged in "indexing" behavior that, an officer testified, was

specifically associated with possession of contraband. *Id.* at 385.

Here, unlike in *Holdorf* and *McHaffie*, no evidence—such as association with drug dealing or current intoxication, nervousness, or indexing movements—sufficiently suggests *current* drug possession in a way that establishes reasonable suspicion of that crime. Consequently, considering the totality of the circumstances, we conclude that Weaver's suspicion that defendant currently possessed methamphetamine was not objectively reasonable. It follows that Weaver unlawfully extended his seizure of defendant when he started investigating defendant's possible involvement with drugs. *Kentopp*, 251 Or App at 534.

The remaining question is whether defendant's voluntary consent to the search of his person—culminating in the discovery of methamphetamine and the other evidence that defendant sought to suppress—derived from that unlawful extension of the seizure. Our determination that defendant was unlawfully stopped for purposes of Article I, section 9, means that the subsequently discovered evidence must be suppressed unless the state proves "that the consent was voluntary and was not the product of police exploitation of that illegality." *Musser*, 356 Or at 150 (citing *Unger*, 356 Or at 74-75).

Here, in arguing that defendant's consent did not result from the illegal seizure, the state relies exclusively on the fact that defendant's consent was voluntary. In *Unger*, however, the Supreme Court "rejected * * * the state's view that voluntary consent generally cures any taint that might have arisen from prior police misconduct[.]" *Musser*, 356 Or at 154. Rather, "voluntary consent [is] an important, but not dispositive consideration," and courts must also examine "the nature of the unlawful conduct, including its purpose and flagrancy, the temporal proximity between the unlawful conduct and consent, and the presence of intervening or mitigating circumstances." *Id.* The state, which bears the burden of proving the absence of "exploitation," *Unger*, 356 Or at 84, has not explained why consideration of those other factors establishes that defendant's consent was not a product of the unlawful seizure. We conclude, therefore, that the

trial court erred in denying defendant's suppression motion. *See Kimmons*, 271 Or App at 602 (concluding that the trial court erred by denying the defendant's motion to suppress, because, "despite the fact that it bears the burden of proving that defendant's consent to the search of her car was sufficiently attenuated from any illegal police conduct, \*\*\* the state offers no reasoned explanation \*\*\* as to why, in the totality of the circumstances of this case, suppression is not required"). Because the evidence that should have been suppressed was essential to defendant's convictions, the error was not harmless.

Reversed and remanded.