Argued and submitted May 5, 2020, resubmitted en banc December 15, 2021; affirmed April 13; petition for review denied July 28, 2022 (370 Or 197)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## RODNEY MONROE MILLER,
*Defendant-Appellant.*

## Marion County Circuit Court
18CR24381; A168644

508 P3d 542

Defendant appeals from a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894 (2017). On appeal, defendant contends that the trial court erred in denying his motion to suppress evidence obtained during a search, because the investigating officer lacked reasonable suspicion to stop him. The circumstances at the time of the stop were (1) that defendant was parked crookedly in an odd spot in a grocery store parking lot late at night; (2) that the officer saw an uncapped syringe that looked "loaded," although the officer did not have a clear view; (3) that the syringe was near defendant's foot on his truck's floorboard; (4) that a butane lighter was visible in defendant's truck door; (5) that defendant had one sleeve of his sweatshirt rolled up; (6) that defendant was nervous when questioned about the syringe; (7) that defendant specifically rejected the possibility that he used the syringe to treat diabetes; and (8) that defendant gave shifting and contradictory statements about his knowledge of the syringe. *Held*: Considering the totality of the circumstances, the Court of Appeals concluded that the officer had an objectively reasonable suspicion that defendant possessed illegal drugs before he initiated the stop.

Affirmed.

En Banc

Donald D. Abar, Judge.

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Philip Thoennes, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, C. J., and Ortega, Egan, Tookey, Shorr, James, Aoyagi, Powers, Mooney, Kamins, Pagán, Joyce, JJ. and DeHoog, J. pro tempore.

SHORR, J.

Affirmed.

Shorr, J., filed the opinion of the court in which Lagesen, C. J., Tookey, James, Aoyagi, Kamins, Joyce, JJ., and DeHoog J. pro tempore, joined.

Powers, J., dissented and filed an opinion in which Ortega, Egan, Mooney, and Pagán, JJ., joined.

**SHORR, J.**

Defendant appeals from a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894 (2017).[1] Following the denial of his motion to suppress evidence obtained during a search, defendant entered a conditional guilty plea, reserving his right to appeal the trial court's ruling. On appeal, defendant contends that the trial court erred in denying his motion because the investigating officer lacked reasonable suspicion to stop defendant, which stop then led to the discovery of incriminating evidence. The state responds that reasonable suspicion supported the stop. As explained below, we conclude that the officer had an objectively reasonable suspicion that defendant possessed illegal drugs before he initiated the stop. As a result, we affirm.

We review the trial court's ruling denying defendant's motion to suppress for legal error. *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017). In so doing, we are bound by the court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Where the court did not make express findings, and there is evidence from which the court could have found a fact in more than one way, we presume that the court decided the facts consistently with its ultimate conclusion. *Id.* We summarize the facts consistent with those standards.

On March 23, 2018, around midnight, Officer Witherell observed a pickup truck parked in the parking lot of an open Safeway store in Stayton. It was snowing, and the truck was parked crookedly in an "odd spot" that would require a person to "walk completely across the parking lot to go into the store." Witherell determined that the truck was registered to defendant and that it was required to have an ignition interlock device. Witherell observed the truck for a few minutes from across the street. After seeing the truck's brake lights come on, Witherell drove his

---

[1] ORS 475.894 was substantially amended between the time of defendant's arrest and prosecution and this writing. *See* Or Laws 2021, ch 2, § 17 (Ballot Measure 110); Or Laws 2021, ch 591, § 349 (modifying and implementing Ballot Measure 110). As a result, we cite to the 2017 version in this opinion.

patrol car back to the Safeway parking lot, watched the truck for a few more minutes, and then approached it on foot.

As Witherell walked up to the truck, defendant—who was in the driver's seat—opened the truck door. Witherell asked defendant "if everything was ok and what was going on," and defendant explained that he was arguing with his girlfriend and held up his phone to Witherell, which Witherell took to mean that defendant was arguing with her on the phone.

During that interaction, Witherell noticed that defendant was wearing a hooded sweatshirt with the left sleeve "pulled up over his elbow" and the right sleeve pulled down to his wrist. Because defendant's truck was "very lifted" such that the truck's floorboard was "almost to [Witherell's] chest level," Witherell noticed that there was an uncapped syringe next to defendant's left foot. Witherell testified that the syringe looked like it was "loaded" but that he "could not get a clear enough view of it." Witherell also noticed a butane lighter in the driver's side door compartment. Witherell testified that butane lighters are consistent with methamphetamine and heroin use because they are used to heat spoons and glass pipes used to ingest methamphetamine and heroin.

Witherell then asked defendant about the syringe. Defendant initially responded, "Needle, I don't know." After Witherell pointed to the syringe, defendant responded, "That one, I couldn't tell ya." Defendant "was acting nervous specifically about the needle." Witherell then asked defendant if there was any other kind of drug paraphernalia in the truck, and defendant said "Bro, I ain't got nothin." Because syringes are used by those with diabetes, the officer asked defendant if he had diabetes. Defendant confirmed that he was not diabetic.

Defendant then offered a new explanation, that he had found the syringe at work earlier and was going to give it to a coworker named Stuart on the next day. At that time, based on defendant's suspicious demeanor, his one rolled-up sleeve, the presence of the syringe and butane lighter, and defendant's nervousness about the syringe, Witherell

asked defendant to get out of the truck. As we discuss later, the trial court concluded that a stop had occurred at that point, and the parties do not contest that conclusion on appeal.[2]

Witherell then frisked defendant for weapons. After the frisk, and without being questioned, defendant offered a different explanation—that he had picked up a man earlier who offered him the syringe. Defendant said that he was arguing with his girlfriend, that he was upset, and that he "hadn't done it yet." Witherell proceeded to seize the syringe and search the truck. Underneath the driver's seat, he discovered a spoon with methamphetamine residue. Underneath the butane lighter, he found a glass pipe with methamphetamine residue. He also found a "wash bottle," which is used "to rinse out syringes or to put water on the spoon and to inject methamphetamine or heroin." Witherell then arrested defendant and gave him *Miranda* warnings. Defendant confirmed that the wash bottle was "just wash." Defendant also said that he had used methamphetamine in the past. When asked what he thought was in the syringe, defendant responded "I'm assuming it was meth." Witherell followed up by asking defendant if it was methamphetamine or heroin, and defendant said, "It's not heroin. I would never touch that shit; it's meth."

Before trial, defendant filed a motion to suppress all evidence derived from the stop. Defendant argued that Witherell unlawfully stopped and seized him in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. At the suppression hearing, defendant argued that Witherell lacked reasonable suspicion to stop and seize him. The state argued the initial encounter was not a stop, and that thereafter Witherell articulated a sufficient basis to believe that defendant possessed a controlled substance, that the plain-view exception justified seizing the syringe, and that the search-incident-to-arrest exception justified the search of the vehicle. In urging the trial court to deny the suppression motion, the state focused on the lawfulness of

---

[2] In our analysis below, we rely only on the facts perceived by the officer before that stop.

the initial contact as the main issue before the court and asserted that "so long as that initial contact was lawful the rest of the evidence that was seized thereafter should be admissible."

The trial court denied defendant's motion. It concluded that Witherell did not stop defendant until he asked him to get out of the truck and frisked him. The trial court further concluded that a sufficient legal basis supported that stop. In making that determination, the trial court found that defendant had been parked crookedly in an isolated spot in a Safeway parking lot late on a snowy night, and that when the officer approached defendant, defendant opened the truck door. The trial court further found that the officer observed a syringe on the truck floor near defendant's feet and a butane lighter in the driver's side door, and that the officer believed—although he was not certain—that the syringe was "loaded." Additionally, the court found that one of defendant's sleeves was rolled up as if he were "about to shoot up." As noted, after the trial court denied defendant's motion, defendant entered a conditional guilty plea, specifically reserving his right to appeal the trial court's ruling denying suppression.

On appeal, defendant renews his contention that he was unlawfully stopped without reasonable suspicion of illegal drug possession, asserting that the trial court erred when it denied his motion to suppress. As noted, the trial court concluded that defendant was stopped when Witherell asked him to step out of the truck and frisked him, and the parties do not contest that conclusion. *See State v. Bowen*, 88 Or App 584, 589, 746 P2d 249 (1987), *rev den*, 305 Or 45 (1988) (holding that the defendant was "clearly stopped" when the officer asked her to step out of the car and frisked her). Defendant maintains, however, that the officer lacked reasonable suspicion of illegal drug possession at that point. The state argues that the court correctly denied defendant's motion because reasonable suspicion supported Witherell's stop of defendant. For the reasons that follow, we conclude that the officer had reasonable suspicion that defendant was about to shoot up illegal drugs that he currently possessed.

Article I, section 9, prohibits "unreasonable" searches and seizures.[3] A "stop" is a type of seizure that amounts to a "temporary detention" conducted "for investigatory purposes." *Maciel-Figueroa*, 361 Or at 169-70. A stop must be justified by a reasonable suspicion of criminal activity. *State v. Rodgers/Kirkeby*, 347 Or 610, 621, 227 P3d 695 (2010).

Reasonable suspicion exists when an officer subjectively believes that a person has committed or is about to commit a specific crime or type of crime, and when that belief is objectively reasonable in light of the totality of the circumstances existing at the time of the stop. *Maciel-Figueroa*, 361 Or at 182. An officer's subjective belief is objectively reasonable when the officer points to specific and articulable facts that support a reasonable inference that the defendant has committed or is about to commit the crime that the officer suspects. *State v. Holdorf*, 355 Or 812, 822-23, 333 P3d 982 (2014). "Reasonable suspicion does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person." *State v. Dampier*, 244 Or App 547, 551, 260 P3d 730 (2011) (internal quotation marks omitted). In analyzing whether an officer had reasonable suspicion to make a stop, we have observed that an officer's training and experience may help to interpret a specific and articulable fact in a given situation, but training and experience is not, in and of itself, a substitute for objectively observable facts. *See, e.g.*, *State v. Schmitz*, 299 Or App 170, 178, 448 P3d 699 (2019).

In this case, defendant does not challenge Witherell's subjective belief that defendant possessed illegal drugs; rather, he argues that the officer's belief was not objectively reasonable under the totality of the circumstances. Accordingly, we review to determine whether Witherell's belief was objectively reasonable under the totality of the circumstances known to him at the time that he stopped defendant. The circumstances were that (1) defendant was parked crookedly in an odd spot in a grocery store parking lot late at night; (2) the officer saw an uncapped syringe that

---

[3] Article I, section 9, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

looked "loaded," although the officer did not have a clear view; (3) the syringe was near defendant's foot on his truck's floorboard; (4) a butane lighter was visible in defendant's truck door; (5) defendant had one sleeve of his sweatshirt rolled up; (6) defendant was nervous when questioned about the syringe; (7) defendant specifically rejected the possibility that he used the syringe to treat diabetes; and (8) defendant gave shifting and contradictory statements about his knowledge of the syringe.

We begin our analysis by acknowledging that this is a case where each fact, *standing alone*, provides either no or little support for the officer's reasonable suspicion. But, as we explain later, these facts do not exist in a vacuum. A group of facts that, standing alone, may not provide much information, when taken together and in context, may provide a different picture that is far clearer.

Looking at some of the facts individually, we readily conclude that the fact that defendant was parked crookedly and in an "odd" spot late at night in a store parking lot provided the officer with no information that defendant was engaged in illegal activity. *See State v. Berry*, 232 Or App 612, 222 P3d 758 (2009) (concluding that there was no reasonable suspicion when the defendant, at 2:30 a.m., pulled into the parking lot of a closed restaurant, offered an implausible explanation for being there, had come from a location the officer knew was associated with drug activity, made furtive movements, and was nervous). That defendant was found with one rolled up sleeve also does not, on its own, provide any basis for reasonable suspicion. *State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004) ("[A] person's appearance alone never can support a reasonable suspicion of unlawful activity.").

We have also repeatedly observed that nervous behavior adds little to the reasonable suspicion inquiry. *See, e.g.*, *State v. Reich*, 287 Or App 292, 299, 403 P3d 448 (2017) (so stating). Although Witherell observed that defendant was nervous—specifically about the needle—that nervousness does not rise to reasonable suspicion of illegal drug possession. *See State v. Rutledge*, 243 Or App 603, 610, 260 P3d 532 (2011) (concluding that there was no reasonable

suspicion of drug possession when the defendant "had just left a motel that the police believed was involved in drug activity, was in a car with a person suspected of drug activity, and acted nervously when asked about her purse").

We have also stated that a defendant's apparent possession of implements that can be used for both illegal drugs and for other legal uses, without more, adds little to the reasonable suspicion analysis. *See State v. Sherman*, 274 Or App 764, 774-75, 362 P3d 720 (2015) (stating that "the presence of a butane torch, without more, does not give an officer reasonable suspicion of criminal activity"); *State v. Oller*, 277 Or App 529, 538, 371 P3d 1268 (2016), *rev den*, 361 Or 803 (2017) (no reasonable suspicion of illegal drug possession when the defendant had been driving a car with syringes in the driver's side door, intravenous drug users are known to use the same type of syringes, and the defendant's passenger was on probation for past drug crimes). Even evidence that a defendant is a drug user or has recently used illegal drugs does not say much at all about whether a defendant currently possesses illegal drugs. *See State v. Kolb*, 251 Or App 303, 314, 283 P3d 423 (2012) (observing that evidence that the defendant was under the influence of methamphetamine did not give rise to a reasonable inference that the defendant possessed methamphetamine paraphernalia that retained methamphetamine residue); *Oller*, 277 Or App at 538 (explaining that, even if the officer could reasonably infer that the defendant was an intravenous drug user, that did not support reasonable suspicion of current possession of illegal drugs). Thus, the presence of the syringe and butane lighter in defendant's truck also, on their own, do not establish reasonable suspicion that defendant currently possessed drugs.

Before turning to a consideration of the facts in concert and the totality of the circumstances, we make a further observation about one individual fact and the reasonable inference that may be drawn from it. As noted, the officer saw an uncapped syringe that looked "loaded" to him, although the officer admitted he did not have a clear view, and that the syringe was visible by defendant's left foot in defendant's truck. The trial court found that although the officer "couldn't say with certainty that the syringe was

loaded when he saw it at [defendant's] foot[,] he believed it was." There is evidence to support that finding. *See Ehly*, 317 Or at 75 (stating that we are bound by the trial court's findings of fact if there is constitutionally sufficient evidence to support them). As a legal matter, it was reasonable for the officer to infer that the presence of the loaded syringe directly at defendant's feet and in his truck indicated that defendant possessed the loaded syringe. *See Oller*, 277 Or App at 537 (stating that it "may well have been reasonable" for the officer to infer that the defendant, who had been driving the car, possessed the syringes observed in the driver's side door).

We now turn to consideration of the facts in context and "the totality of the circumstances existing at the time of the stop." *Maciel-Figueroa*, 361 Or at 182. As noted, if we consider each observed fact known to the officer entirely on its own and without reference to each other—that defendant had an uncapped and "loaded" syringe at his feet, one rolled up sleeve, and a butane lighter in the door near him—we might reach a different result. But those facts did not exist on their own. Taken in concert, those facts inform each other and at least raise the likelihood that the officer happened to approach defendant's car on foot as defendant was about to shoot up some kind of drug. The officer also testified that, in his experience, a butane lighter is consistent with methamphetamine and heroin use.

Then, there are the additional contextual facts that inform the analysis. Prior to the stop, defendant offered shifting and inconsistent explanations for the presence of the loaded syringe. Defendant first entirely denied knowledge of the syringe and then, shortly afterwards, contended that that he had found the syringe at work earlier and was going to give it to a coworker on the next day. Defendant's inconsistent explanations—that may, again, on their own not provide reasonable suspicion that defendant possessed illegal drugs—at least suggest that defendant may not have been telling the truth about the syringe and was trying to disclaim ownership because he was aware of the syringe's illegal contents. Significantly, and distinguishing this case from other cases where a syringe was found, defendant also denied the possibility that he was using the syringe for a

very common legal use, namely, to inject insulin to treat diabetes. Taken all together, as we must consider them, the facts are sufficient to support the officer's reasonable suspicion that defendant was about to shoot up illegal drugs and currently possessed them in the syringe observed at his feet. That is enough to meet the reasonable-suspicion standard required for a stop under Article I, section 9.

Indeed, we recently held that an officer had probable cause, a higher standard than reasonable suspicion, to believe that a defendant possessed methamphetamine after the officer observed a syringe in plain view under circumstances not substantially different—and perhaps less compelling—than the facts at issue here. *State v. Wise-Welch*, 318 Or App 146, 148, 506 P3d 454 (2022). The officer initially contacted the occupants of a parked vehicle in the parking lot of a closed boat ramp. *Id.* at 147. Through an open passenger door, the officer observed a glass pipe with crystalline residue near the defendant and a syringe "with the plunger pulled back suggesting it was ready for use" in the defendant's open purse. *Id.* The officer subjectively believed that the pipe contained methamphetamine and that the syringe was going to be used for injecting the drug. *Id.* The syringe later tested positive for methamphetamine. *Id.* Importantly, the opinion does not state that the officer observed anything in the syringe. However, we rejected the defendant's argument that the incriminating character of the syringe was not immediately apparent. *Id.* We noted that a normally benign object like a syringe may nonetheless be subject to seizure and have an incriminating character depending on the context in which it is found. *Id.* at 148. We concluded that, in light of the circumstances in which the defendant's syringe was found, the officer had probable cause to believe that the syringe contained illegal contraband, namely methamphetamine. *Id.* As discussed, here the context of all of the facts similarly support the trial court's conclusion that the officer had reasonable suspicion to believe that the syringe contained illegal drugs.

Finally, defendant does not develop a separate argument that the officer's actions violated the Fourth Amendment. Instead, defendant largely relies on citation to two Oregon cases for the proposition that the required

analysis under the Oregon Constitution is either "not meaningfully different" or is "effectively the same" as that required under the United States Constitution. *See State v. Backstrand*, 354 Or 392, 402 n 11, 313 P3d 1084 (2013); *State v. Bond*, 189 Or App 198, 204, 74 P3d 1132 (2003), *rev den*, 336 Or 376 (2004). To the extent that there may be nonmeaningful differences that might affect the outcome of this case, defendant does not articulate them in his brief. Accepting defendant's argument and for the reasons expressed above, we also conclude that the officer had reasonable suspicion to stop defendant under the Fourth Amendment.

We conclude by noting our respectful disagreement with the dissent. The dissent concludes that this is a case in which we are stacking inferences to reach our conclusion. We acknowledge one underlying inference that does, in fact, underlie all of the others: That defendant *possessed* the loaded syringe at his feet. We recognize that if it could be said that defendant had not possessed the syringe, we may not be able to then conclude that the officer had reasonable suspicion that defendant possessed illegal drugs. We do not understand the dissent to contest that point, however. The remaining facts that are important to our analysis do not rely on stacking logical inferences that each, in turn, depend on the validity of the prior underlying inference. As noted, instead, we have numerous facts that, when taken alone, may not be sufficient, but when considered together, as we must view them, paint a picture that is enough to meet the reasonable-suspicion standard.

The dissent also relies on cases that ultimately reduce to the principle that evidence that a person is a drug user—whether past, present or habitual—combined with their mere possession of drug paraphernalia like syringes, which have entirely legal uses, do not give rise to reasonable suspicion of current possession of illegal drugs *without additional evidence*. That principle is sound because, as noted, the mere fact that there is evidence that a person used drugs says very little about whether the person currently possesses illegal drugs. Even the presence of drug paraphernalia, which can have legal uses, does not tell us much about whether an individual currently possesses illegal drugs without more. Those cases, however, have a more

limited application here, where there is additional evidence such that the officer encountered defendant in circumstances where the officer could reasonably suspect that defendant had been stopped when he was in the *process* of injecting illegal drugs and thereby currently possessed them.

In sum, we affirm the trial court's denial of the motion to suppress, because, at the point the officer stopped defendant and asked him to step out of the car, the officer had reasonable suspicion that defendant possessed illegal drugs.

Affirmed.

**POWERS, J.,** dissenting.

In my view, the circumstances preceding the stop do not support objective reasonable suspicion of possession of a controlled substance. Although I do not quibble with the existence of the legal principle used by the majority opinion that the sum may be greater than its parts, I part ways in its application in this case because the individual circumstances identified by Officer Witherell fall short of the constitutional standard. We should not stack inferences to fill gaps in the officer's testimony, to mix my metaphors. Properly viewed, the specific and articulable facts in this case combined with the reasonable inferences that may be drawn from them, including defendant's truck in an odd parking spot at night, the presence of a butane lighter, defendant's rolled-up sleeve and nervousness—even when combined with a potentially "loaded" syringe and defendant's explanations about that syringe—are insufficient to constitute reasonable suspicion of illegal drug possession. Accordingly, I respectfully dissent.

To determine that an investigative stop was lawful under Article I, section 9, of the Oregon Constitution, we (1) must conclude that an officer actually suspected that the stopped person had committed a specific crime or type of crime, or was about to commit a specific crime or type of crime, and (2) must conclude, based on the record, that an officer's subjective belief was objectively reasonable under the totality of the circumstances existing at the time of the stop. *State v. Maciel-Figueroa*, 361 Or 163, 182, 389 P3d

1121 (2017). That is, reasonable suspicion exists when an officer is able to point to specific and articulable facts that give rise to an inference that criminal activity is afoot. *See, e.g.*, *State v. Lichty*, 313 Or 579, 584, 835 P2d 904 (1992). An officer may not detain an individual based solely on intuition or experience. *State v. Holdorf*, 355 Or 812, 823, 333 P3d 982 (2014). Rather, the officer must have a subjective belief that is objectively reasonable under the totality of the circumstances. *State v. Kreis*, 365 Or 659, 665, 451 P3d 954 (2019). Important to this case, the distinction between an officer's improper reliance solely on intuition and the officer's permissible reliance on reasonable suspicion of criminal activity "reduces largely to the officer's ability to identify and describe the observable facts that lead the officer—in light of the officer's training and experience—to suspect that a person has committed, is committing, or is about to commit a crime." *State v. Walker*, 277 Or App 397, 402, 372 P3d 540, *rev den*, 360 Or 423 (2016).

Where reasonable suspicion is based upon a chain of interlocking inferences, we assess whether those inferences are individually and collectively reasonable. *State v. Oller*, 277 Or App 529, 535, 371 P3d 1268 (2016), *rev den*, 361 Or 803 (2017). "If the premises collectively are impermissibly speculative, or if any of the premises is individually insupportable, the stop was not supported by reasonable suspicion." *State v. Kolb*, 251 Or App 303, 313, 283 P3d 423 (2012) (citing *State v. Bivins*, 191 Or App 460, 466-71, 83 P3d 379 (2004)). That is because an inferential chain can become "too tenuous" to support a nonspeculative suspicion of criminal conduct. *Id.*

As an initial matter, I agree with the majority opinion when it concludes that each circumstance described by Witherell standing alone provides little to no support for establishing reasonable suspicion. For example, parking in an odd spot at night, having a rolled-up sleeve, being nervous when questioned by the officer, and seeing a butane lighter in defendant's truck all fall short for the reasons described by the majority opinion. *See, e.g.*, *State v. Messer*, 71 Or App 506, 509, 692 P2d 713 (1984) (explaining that not all "persons who sit in vehicles in parking lots at odd hours of the night or morning * * * render themselves suspect and subject to

being stopped by a passing police officer" (footnote omitted)); *State v. Morfin-Estrada*, 251 Or App 158, 168-69, 283 P3d 378, *rev den*, 352 Or 565 (2012) (collecting cases that recognize reasonable suspicion cannot be based entirely on a person's appearance); *State v. Reich*, 287 Or App 292, 299, 403 P3d 448 (2017) (observing that "nervous behavior adds little to the reasonable suspicion inquiry"); and *State v. Sherman*, 274 Or App 764, 774, 362 P3d 720 (2015) (explaining that the "presence of a butane torch, without more, does not give an officer reasonable suspicion of criminal activity").

The focus of my disagreement with the majority opinion centers on the presence of the potentially loaded syringe. As described by the majority opinion, Witherell noticed an uncapped syringe next to defendant's left foot. Witherell did not describe what the syringe looked like, provide any details about any contents in the syringe, or discuss any significance of the syringe. At the suppression hearing, the prosecutor did not ask Witherell to describe the syringe other than the following exchange:

"Q   [by the prosecutor]: Okay. Could you tell at that point whether or not the syringe was loaded or not?

"A   [by Witherell]: It looked like it was, but I could not get a clear enough view of it. It was not capped; it was uncapped[.]"

That is the entirety of the testimony describing the syringe. Notably absent from the record is any discussion of what "loaded" means and whether the syringe was potentially loaded with a legal or illegal substance. Did that mean that it was full of liquid or merely that the plunger was drawn back and that he could not see what was in the syringe? Unlike his testimony about the butane lighter, Witherell never explained why he connected the syringe with illegal drug use. That is, there was nothing about whether any substance in the syringe appeared to be consistent or inconsistent with illegal drug use. Similarly, there was no evidence of whether Witherell could tell with a glance that the potentially loaded syringe was consistent or inconsistent with a more benign use such as to administer medication to a pet or for use by someone treating diabetes or another medical condition. Although the state does not need to prove the

latter, it should be held accountable for its failure to establish the former. *See Lichty*, 313 Or at 585 (concluding that there was reasonable suspicion where there was evidence in the record of general knowledge regarding the appearance of cocaine combined with an officer's own expertise about illegal drugs). Indeed, Witherell's testimony raised only one possible use—and a legal use at that—for the syringe when he asked defendant if he was diabetic. Importantly, Witherell never explicitly connected the syringe to methamphetamine, heroin, or any other illegal drug or provided any detail about the syringe that would make that type of connection objectively reasonable.[1]

The absence of those details is significant; however, the gaps in the testimony do not hinder the majority opinion's conclusion that the trial court correctly denied the suppression motion. Instead, as I understand the majority

---

[1] Just how thin the record is about the syringe is exemplified by the following exchange that forms the bulk of Witherell's testimony on the subject:

"Q [by the prosecutor]:  Okay. And so, what did you do after you saw those items?

"A [by Witherell]:  I asked him about it; I asked him about the syringe. He initially said, I don't remember his direct quote, I believe it was his first one when I asked about the needle was that he said, 'Needle, I don't know.' I then later pointed it out. Well, first I asked him if it was his truck to make sure it was his vehicle. And he said, 'Well, yes it is,' then he laughed. But then I pointed out that syringe and he looked down and said—let's see—'That one, I couldn't tell ya.' At that point I asked if there was any other kind of drug paraphernalia in the car and he said, 'Bro, I ain't got nothin.'

"Q:  Okay. And then what happened after that?

"A:  Well, my next question was is I asked him are you diabetic, because syringes are consistent if he has diabetes. So I asked him if he's diabetic and he said no that he was not. I asked him if he understood why I was curious and he said that he did. He also said that he was at work earlier, he had found the syringe and had picked it up and was going to give it to a co-worker the next day named Stuart.

"Q:  Okay. And then, did you ask any additional questions regarding the items after that?

"A:  No. Shortly after that I—after seeing his demeanor was suspicious to me; the sleeves, one up, one down, the needle, the butane lighter. He was acting nervous specifically about the needle. I asked him to get out of his vehicle at that point."

Moreover, although defendant does not raise the issue, it is questionable whether the officer could even ask the diabetes question without effectuating a stop in light of *State v. Reyes-Herrera*, 369 Or 54, 67-68, 500 P3d 1 (2021) (addressing when verbal statements by law enforcement will constitute a stop or seizure under the state constitution).

opinion, it is permissible to take Witherell's testimony about not being able to get a clear view of the syringe, seeing that it was uncapped near defendant's foot, and looking "like it was" loaded and then fill in the gaps of that testimony by assessing the totality of the circumstances to conclude that it was objectively reasonable to conclude that the syringe was (a) loaded, as in full of liquid; (b) loaded with illegal drugs; and (c) loaded with illegal drugs for defendant's use. We should not stack inference upon inference to make up for the deficiencies in the record. Accordingly, I would conclude that here, as in *Oller*, that chain of interlocking inferences fails to establish reasonable suspicion.

In *Oller*, the officer stopped the defendant for a traffic violation after noticing that the defendant's passenger was a known drug user who was on probation for drug crimes. 277 Or App at 530-31. After he finished processing the traffic violation, the officer lawfully observed syringes in the pocket of the defendant's driver's side door that "were of a type that intravenous drug users typically use." *Id*. at 531. At that point, the officer believed he had reasonable suspicion to extend the stop to investigate the defendant for a drug offense. *Id*. On appeal, we concluded that the officer's suspicion of current drug possession was not objectively reasonable, and therefore, the officer unlawfully seized the defendant. *Id*. at 538. In reaching that conclusion, we explained that the officer relied on an impermissible stacking of inferences to arrive at the conclusion that the defendant possessed illegal drugs:

> "(1) because defendant had been driving the car, the syringes in the driver's side door were likely hers; (2) because defendant apparently possessed syringes that were of a type that [the officer] knew to be used by intravenous (IV) drug users and defendant was in the presence of a known drug user, defendant was likely to be an IV drug user herself; and (3) because IV drug users who carry drug paraphernalia may also possess illegal drugs—which, without more, is itself arguably speculative—defendant herself might possess illegal drugs."

*Oller*, 277 Or App at 536-37 (footnotes omitted).

In analyzing those three inferences, we acknowledged that the first inference might be reasonable and then

explained why the next two inferences were unsound. *Id*. at 537-38. Importantly, we expressed skepticism that the officer's testimony supported the second inference—that defendant was an IV drug user because she had the same type of syringe that other IV drug users used—because the officer "gave no description of the syringes themselves that would aid the court in evaluating whether defendant's possession of them indicated that she was an active drug user." *Id*. at 537. We then rejected the third inference, explaining that, "even if [the officer] could reasonably infer that defendant was a drug user, evidence of a person's past or even routine drug use, without additional evidence, does not give rise to the reasonable inference that the person currently possesses drugs." *Id*. at 538.

In my view, none of the reasonable inferences that can be drawn from the totality of the circumstances in this case lead to the ultimate inference that defendant possessed illegal drugs, which the majority opinion uses to justify Witherell's stop of defendant when he ordered defendant to get out of the truck. We should not fill the gaps in the testimony with stacked inferences about the nature and content of the potentially loaded syringe. As in *Oller*, only an impermissible stacking of inferences connected the syringe, lighter, and defendant's rolled-up sleeve with the ultimate inference that he possessed illegal drugs. In forming the belief that defendant possessed illegal drugs, Witherell necessarily relied upon the following chain of interlocking inferences: (1) the syringe and lighter belonged to defendant because they were in his truck; (2) because he had a butane lighter, which can be used to prepare drugs such as heroin and methamphetamine for consumption, defendant likely used illegal drugs; (3) because there was an uncapped and potentially loaded syringe lying on the floor near defendant's foot and defendant was not diabetic, he was likely to be an intravenous drug user; (4) because defendant had one sleeve rolled up over his elbow, he likely used, or planned to use, illegal intravenous drugs; and (5) thus, defendant presently possessed illegal drugs.

The first inference is reasonable, given that the items were in defendant's truck. The second and third

inferences—that the lighter and potentially "loaded" syringe show that defendant uses illegal drugs—are less reasonable. First, butane lighters or torches are "not exclusively used for drug ingestion" and are not in themselves illegal. *Sherman*, 274 Or App at 774. Second, as we have explained previously in *Oller*, possession of a syringe alone cannot support the inference that defendant used it to inject illegal drugs. 277 Or App at 537. Witherell described the syringe as uncapped, lying on the floor near defendant's foot, and potentially "loaded." He did not explain what he meant by the term "loaded" or otherwise describe the contents of the syringe. Although the syringe may be evidence of intravenous drug use, it does not necessarily establish present possession of illegal drugs. *See Oller*, 277 Or App at 538 (explaining that "evidence of a person's past or even routine drug use, without additional evidence, does not give rise to the reasonable inference that the person currently possesses drugs"). Had Witherell's testimony more concretely established that what he saw as a potentially "loaded" syringe created reasonable suspicion of illegal—as opposed to legal—drug use, this may have been a different case. But here, as the trial court recognized, Witherell's testimony merely established that the syringe might have been loaded. Therefore, in my view, although it may be a permissible inference to conclude that the syringe was in fact loaded with a drug, it requires further impermissible speculation to conclude that the syringe was loaded with an illegal substance.[2]

--------

[2] The majority opinion's reliance on *State v. Wise-Welsh*, 318 Or App 146, 506 P3d 454 (2022), is unavailing for a number of reasons. First, the snippets of the officer's testimony recounted in our opinion provide more detail about the syringe and surrounding circumstances found in that case compared to the record before us in this case. For example, the officer in *Wise-Welsh* saw a glass pipe "containing crystalline residue" near the defendant and a syringe "with the plunger pulled back suggesting it was ready for use." *Id*. at 147. In this case, however, Witherell's testimony is noticeably silent on those types of details about the syringe or the surrounding circumstances. More significantly, the officer in *Wise-Welsh*, unlike Witherell in this case, articulated a subjective belief about the contents of the pipe and the syringe. *See id*. (explaining that the officer "believ[ed] that the pipe contained methamphetamine and that the syringe was likewise going to be used for ingesting methamphetamine"). Second, the parties' briefs in *Wise-Welsh* described in more detail the officer's testimony, which included a description of his training and experience in drug enforcement and recognition, his belief that one of the defendant's companions was under the influence of methamphetamine, and that he was familiar with the appearance of methamphetamine and the ways in which people use it. It is precisely that sort of testimony that is missing in this case—testimony that provides the necessary context to support a conclusion that

Likewise, the fourth inference that defendant was about to inject illegal intravenous drugs because one of his sleeves was rolled up is too speculative, even considering the presence of the uncapped syringe near defendant's foot. We have declined to find reasonable suspicion of illegal drug possession even in circumstances where there was more clear evidence of drug use. For instance, we have held that there was no reasonable suspicion to support a stop for illegal drug possession when the defendant was found walking and dancing alongside a highway, wearing dirty and unkept clothing with one arm exposed, that arm bore track marks indicative of intravenous drug use, and the officer suspected that the defendant used illegal drugs the night before. *State v. Holcomb*, 202 Or App 73, 75, 121 P3d 13, *adh'd to as modified on recons*, 203 Or App 35, 125 P3d 22 (2005). Here, although the inference centered on impending drug use rather than past or recent drug use, the circumstances were even less suspicious: one of defendant's arms was exposed, but neither his behavior nor the skin on his exposed arm suggested past or recent drug use.

Finally, even if the specific and articulable facts adduced at the suppression hearing—and the reasonable inferences drawn from them—established that defendant was a habitual drug user, had recently used illegal drugs, or was currently under the influence of illegal drugs, those facts alone would still be insufficient to establish reasonable suspicion that he currently possessed illegal drugs. *See Holcomb*, 202 Or App at 77-78 (explaining that evidence of recent drug use did not support a reasonable inference that the defendant currently possessed drugs); *Kolb*, 251 Or App at 314 (observing that evidence that the defendant was under the influence of methamphetamine did not give rise to a reasonable inference that the defendant possessed

---

an inference is objectively reasonable, rather than merely speculative. Finally, fact-matching when weighing the totality of the circumstance is a fraught business. *See, e.g.*, *Dorn v. Teacher Standards and Practices Comm.*, 316 Or App 241, 249, 504 P3d 44 (2021) ("Fact-matching between similar cases is inexact."); *State v. Sierra*, 349 Or 506, 515-16 n 5, 254 P3d 149 (2010), *adh'd to as modified on recons*, 349 Or 604, 247 P3d 759 (2011) ("Fact-matching can be a misleading enterprise."). Fact-matching gets even more dicey when trying to analogize to a decision that succinctly describes the circumstances and, thus, can be of nominal persuasive value.

methamphetamine paraphernalia that retained metham-phetamine residue); *Oller*, 227 Or App at 538 (explaining that, even if the officer's observations indicated that the defendant was an intravenous drug user, that did not sup-port reasonable suspicion of current possession of illegal drugs).

In short, because the record before us is insufficient to establish reasonable suspicion, I would conclude that the trial court erred in denying defendant's motion to suppress. As the Supreme Court has observed, "[w]e cannot presume the existence of other favorable facts; we must confine our review to the record made." *State v. Bates*, 304 Or 519, 527, 747 P2d 991 (1987). Because the majority opinion fills gaps in the officer's testimony by stacking inference upon infer-ence to support its conclusion, I respectfully dissent.

Ortega, Egan, Mooney, and Pagán, JJ., join in this dissent.